STATE OF NEBRASKA, APPELLEE, V. JOHN J. JOUBERT, APPELLANT.
455 N.W.2d 117

Filed May 4, 1990.   No. 89-224.

J. Joseph McQuillan, of Walentine, O'Toole, McQuillan & Gordon, for appellant.

Robert M. Spire, Attorney General, and Sharon M. Lindgren for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

# I. INTRODUCTION

Defendant, John J. Joubert, appeals from the denial of the motion he filed pursuant to the Nebraska Postconviction Act, Neb. Rev. Stat. §§ 29-3001 et seq. (Reissue 1989), seeking an order "vacating or setting aside" each of the two convictions for first degree murder and the resulting sentences of death which were affirmed on direct appeal in *State v. Joubert,* 224 Neb. 411, 399 N.W.2d 237 (1986) (*Joubert I*). He asserts, in summary, that the postconviction judge erred in failing to (1) disqualify himself, (2) find that Joubert's trial attorneys were ineffective by virtue of a conflict of interest and by virtue of advising him to plead guilty, and (3) find that the receipt of certain victim impact statements into evidence at the penalty phase of the trial did not prejudice Joubert. We affirm.

# II. ANALYSIS

We begin our review of this matter by recalling that one seeking postconviction relief has the burden of establishing the basis for such relief and that the findings of the postconviction court will not be disturbed unless they are clearly wrong. *State v. Williams,* 234 Neb. 890, 453 N.W.2d 399 (1990); *State v. Reeves,* 234 Neb. 711, 453 N.W.2d 359 (1990); *State v. Harton,* 230 Neb. 167, 430 N.W.2d 313 (1988). Moreover, it is the postconviction judge who, as the trier of fact, resolves conflicts in the evidence and questions of fact, including the credibility and weight to be given the testimony of a witness. *State v. Costanzo, ante* p. 126, 454 N.W.2d 283 (1990); *State v. Reeves, supra; State v. Domingus,* 234 Neb. 267, 450 N.W.2d 668 (1990). With those cardinal principles in mind, we proceed to an analysis of each of Joubert's claims for relief.

## 1. Nondisqualification

With respect to the first summarized assignment of error, Joubert argues that his postconviction action should at least be remanded for a new hearing because the postconviction judge, who was also the judge presiding over the guilt phase of the trial

and, as such, accepted Joubert's pleas of guilty, refused to disqualify himself from presiding over the postconviction proceedings.

Joubert based this disqualification motion upon the assertion that the judge would be called as a witness in the proceedings. This assertion, in turn, rested upon a portion of the argument relating to Joubert's second assignment of error, i.e., that Joubert's trial attorneys were ineffective in failing to litigate the issue of the admissibility of his confession, a matter which is analyzed later in part II(2)(b)(iii) of this opinion.

In attempting to support his disqualification motion, Joubert argued that his trial attorneys' failure to litigate the motion to suppress his confession could have been the result of off-the-record in camera communications between the trial attorneys and the judge. Thus, Joubert reasoned that the judge should be available as a witness and therefore, to preserve his availability as such, should not preside over the postconviction hearing. See Neb. Rev. Stat. § 27-605 (Reissue 1989), which provides that a presiding judge at the trial may not testify in that trial as a witness.

At a hearing on this motion Joubert, through his postconviction attorney, argued:

> So then you get in the situation you say, "Well, how do I know you're going to use me as a witness . . . ? How do I know I have to disqualify myself?" So that I have to respond "I don't know until I find out. I don't know until I inquire whether, in fact, you have any information which may or may not be probative in this case." I think I have a right and an obligation to so inquire.

After further argument and a rebuttal by the State, the judge stated the following:

> At this point of time I'm going to deny the motion to recuse. That's without prejudice to going ahead and file [sic] your notice to take depositions, but let me indicate in advance to you that a motion to quash . . . will be looked upon with favor until you develop some evidence somewhere, either by the testimony of [the prosecutor] or the testimony of Mr. Miller or testimony of somebody that, in fact, there were communications with me that

were not on the record.

Now, I can indicate to you, and it may save you time, to my memory there aren't any. I think I had [the court reporter] every single time when I had Mr. Miller and [the prosecutor] and certainly I know that when the defendant was present, and if they testify to the contrary, I'm not saying they're right or wrong. Maybe my memory's failing
. . . .

. . . .

. . . [I]f you develop some testimony or evidence that makes me a witness on the factual matters, you don't need to file another motion to recuse. I'll step down on my own motion . . . if, in fact, it turns out that I become a witness to some factual matters.

Thus, Joubert's disqualification motion was denied because there was no indication that there was any basis for his claim that the judge was a necessary witness in the postconviction proceeding.

Joubert's brief cites *The People v. Wilson*, 37 Ill. 2d 617, 230 N.E.2d 194 (1967), for the proposition that in a death penalty postconviction proceeding, a judge who has knowledge of off-the-record statements from a prior proceeding at the district court level should recuse himself from the postconviction hearing, and states:

Indeed it is clear that petitioner herein was prevented from access to relevant evidence. There can be no doubt that there were many conversations that took place off the record in the judge's chambers during the proceedings of the Joubert case on the District Court level. *Wilson*. As such, Joubert was denied access to this material in the form of a judge's recollection of what transpired during the Joubert case. The judge from the prior proceeding was directly involved and has a version of the facts which are relevant and material and may at times offer information not available from other sources.

Brief for appellant at 37. However, the record before this court reveals no evidence of any relevant off-the-record conversations involving the judge, nor does the record support an assertion that the judge had any information not readily

available from other sources. The judge said discovery could be pursued on the issue and that he would recuse himself on his own motion if evidence that he had been involved in relevant off-the-record conversations were discovered. The record presents no such evidence.

There is no rule of law which automatically disqualifies a judge who has presided at trial from subsequently considering a postconviction action. *State v. Herren*, 212 Neb. 706, 325 N.W.2d 151 (1982). Furthermore, the mere assertion by a convicted defendant that he may wish to call the trial judge as a witness in a postconviction hearing does not, by itself, provide grounds for disqualifying the trial judge from presiding over the postconviction proceeding. See, *Sivak v. State*, 112 Idaho 197, 731 P.2d 192 (1986); *Logan v. State*, 712 S.W.2d 9 (Mo. App. 1986); *Welch v. State*, 283 Ark. 281, 675 S.W.2d 641 (1984); *People v. Neal*, 123 Ill. App. 3d 148, 462 N.E.2d 814 (1984).

Joubert also argues that the postconviction judge exhibited bias when he examined witnesses during the postconviction proceeding and through the comments which he made during that proceeding.

As stated in *State v. Ellefson*, 231 Neb. 120, 122, 435 N.W.2d 653, 655-56 (1989):

> A motion to disqualify a judge on the ground of bias or prejudice is addressed to the judge's discretion, and an order overruling such a motion will ordinarily be affirmed on appeal unless the record establishes bias or prejudice as a matter of law. [*State v. Reddick*, 230 Neb. 218, 430 N.W.2d 542 (1988).] A party seeking to disqualify a judge on the basis of bias or prejudice bears the heavy burden of overcoming the presumption of judicial impartiality. *State v. Bird Head*, 225 Neb. 822, 408 N.W.2d 309 (1987).

The comments and questions of the postconviction judge cited by Joubert as evidence of bias, including the judge's inquiry as to whether Miller had not defended a particular case, were offered by the judge in an effort to clarify the record which was being created, and do not support an inference of prejudice or predisposition on his part. Consequently, Joubert's first summarized assignment of error is without merit.

## 2. Effectiveness of Counsel

In the second summarized assignment of error Joubert urges that he was denied the effective assistance of counsel guaranteed him by the 6th amendment to the federal Constitution and made applicable to the State through that document's 14th amendment. He assigns as grounds for this assertion the claims that his attorneys had a conflict of interest and performed defectively in advising him to plead guilty.

The analysis of the claim that Joubert's attorneys were ineffective begins with the rule that in a postconviction action seeking relief on the basis of ineffective counsel, a defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defense. *State v. Sanders, ante* p. 183, 455 N.W.2d 108 (1990); *State v. Williams,* 234 Neb. 890, 453 N.W.2d 399 (1990); *State v. Domingus,* 234 Neb. 267, 450 N.W.2d 668 (1990); *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

The standard for determining the adequacy of a criminal defense attorney's performance is whether the attorney performed at least as well as an attorney with ordinary training and skill in the criminal law in the area. *State v. Williams, supra; State v. Reeves,* 234 Neb. 711, 453 N.W.2d 359 (1990); *State v. Domingus, supra.* In this connection *Strickland v. Washington* admonishes at 466 U.S. at 689-90:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle v. Isaac,* 456 U. S. 107, 133-134 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See *Michel v. Louisiana,* [350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N. Y. U. L. Rev. 299, 343 (1983).

. . . .

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

In order to satisfy the prejudice requirement in the context of a plea, the defendant must show that there is a reasonable probability that but for counsel's errors, the defendant would not have pled and would have insisted upon going to trial. *State v. Domingus, supra,* citing *State v. Wakeman,* 231 Neb. 66, 434 N.W.2d 549 (1989).

With that background we move on to a review of the claims on which is based Joubert's assertion that his trial attorneys

were ineffective.

### (a) Conflict of Interest

Joubert's first claim is that his trial attorneys had a conflict of interest arising from the professional relationship between George Burr, one of his attorneys, and Judy and Leonard Eberle, the parents of the late Danny Joe Eberle, one of Joubert's victims.

After Joubert's arrest and through his appeal in *Joubert I*, he was represented by the Sarpy County Public Defender's office. When that office began to represent Joubert, it was comprised of the elected Sarpy County Public Defender, James Miller, and his two assistants, Owen Giles and Burr. Such remained the composition of the office until approximately September 21, 1984, when Burr was discharged.

Sometime between Joubert's July 3, 1984, guilty pleas and the date Burr was discharged, Burr was directed by Miller to contact the Eberles and see if they would be willing to write a letter requesting that the judge sentence Joubert to imprisonment for life rather than to death. Burr was selected for this task because he, like the Eberles, was a Bellevue resident. When Burr called Judy Eberle, she reminded him that he had previously handled the Eberles' adoption of a daughter. Burr testified that prior to this conversation with Judy Eberle, he had forgotten his previous representation of the Eberles but later confirmed, through his "old files," that he had in fact done so. The adoption had occurred 8 to 10 years earlier, apparently in 1975 or 1976. Burr then informed Miller and Giles of this past representation, a matter previously unknown to them.

On December 7, 1984, Burr filed a federal bankruptcy petition on behalf of the Eberles. The evidence as to when the Eberles and Burr first discussed the matters resulting in this representation is in conflict, but the postconviction judge found as fact that such occurred after the "sentencing hearings and order of sentence." The postconviction judge then concluded that Joubert's attorneys had a conflict of interest only with respect to their "actions subsequent to the sentencing and prior to" Burr's departure from the public defender's

office, a conclusion which is difficult to understand in light of the fact that Burr was discharged from the public defender's office on approximately September 21, 1984, while Joubert's sentencing did not occur until October 9, 1984. Thus, it appears that the postconviction judge may have erred in finding that a conflict of interest existed at all. However, even if it were assumed that a conflict of interest existed because of any relationship between Burr and the Eberles, the record still fails to support a claim that Joubert's convictions should be set aside or vacated.

In *State v. Williams*, 224 Neb. 114, 396 N.W.2d 114 (1986), Williams was convicted of first degree murder and sentenced to death. At trial and during his first postconviction action, Williams was represented by the Lancaster County Public Defender's office. In his second motion for postconviction relief, Williams alleged that a member of the public defender's office had represented Williams' wife in an action to dissolve her marriage with Williams and that this constituted a conflict of interest that deprived him of effective assistance of counsel. Williams claimed that the conflict had prevented his trial counsel from calling his wife as a witness during his trial in support of his insanity defense.

In concluding that because Williams failed to show he was adversely affected by his counsel's possible conflict of interest, the *Williams* court noted:

> In *Strickland v. Washington*, [466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the Court discussed a "per se rule of prejudice" and a "rule of presumed prejudice":
>
> "In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. See *United States v. Cronic, ante,* at 659, and n. 25. Prejudice in these circumstances is so likely that case by case inquiry into prejudice is not worth the cost. *Ante,* at 658. Moreover, such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the

government to prevent.

"One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler v. Sullivan*, 446 U.S., at 345-350, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, *e. g.*, Fed. Rule Crim. Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' *Cuyler v. Sullivan, supra,* at 350, 348 (footnote omitted)." *Strickland v. Washington*, 466 U.S. 668, 692, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

As indicated in *Strickland v. Washington, supra,* a conflict of interest, per se, does not annihilate or frustrate a defendant's constitutional right to effective assistance of counsel, necessitating reversal of a judgment in a criminal case. However, there is a presumption of prejudice involving a defendant's constitutional right to effective assistance of counsel when a defendant demonstrates (1) counsel actively represented conflicting interests and (2) an actual conflict of interest adversely affected performance by the defendant's lawyer. Such conflicts of interest must be shown to have resulted in counsel's conduct detrimental to the defense.

Regarding prejudice on account of ineffective assistance of counsel, *Strickland* contains the following observation by the Court:

"Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." *Id.* at 697.

Putting aside the question whether an actual conflict of interest exists in the case before us, and following the suggestion in *Strickland*, we dispose of Williams' appeal on the basis of presence or absence of prejudice.

*State v. Williams*, 224 Neb. 114, 121-22, 396 N.W.2d 114, 119-20 (1986).

As in *Williams*, it is appropriate in this case to put aside the question whether an actual conflict of interest existed, to follow the suggestion in *Strickland*, and to dispose of the issue on the basis of the presence or absence of prejudice.

While Joubert speculates in his brief that Burr's professional relationship with the Eberles "might motivate a less than zealous defense" of him, brief for appellant at 16, the reality is that neither the record nor Joubert's brief illustrates that Burr's relationship with the Eberles had any effect whatsoever on Joubert's defense. That being so, Joubert's claim that his attorneys were ineffective by virtue of a conflict of interest is without merit.

### (b) Plea Advice

As the result of a plea bargain, Joubert pled guilty to the two

charges of first degree murder, in exchange for which the State dismissed two kidnapping and two using a knife to commit a felony charges; refrained from arguing for the death penalty; refrained from offering in evidence a presentence investigation; refrained from making *"any effort* in regard to the Maine case" (emphasis supplied) (investigating Joubert's involvement in the murder of still another young boy); and agreed Joubert could remain silent notwithstanding his pleas.

The significance of the reference to the "Maine case" is illustrated by the fact the prosecutor informed Giles that the State had been working with authorities from Maine regarding another murder which had occurred in that state. Based upon his communications with the prosecutor, Giles testified that if Joubert had been convicted at a trial on his Nebraska charges, the State would have attempted to prove that Joubert had committed the murder being investigated in Maine. Giles noted that if the State had been successful in presenting such proof, this prior uncharged murder would have represented an aggravating circumstance which would have increased Joubert's chances of receiving a death sentence. Because Joubert had informed his attorneys that he in fact had been involved in a Maine homicide, Miller and Giles concluded that it was important to prevent the State from presenting evidence with respect to that additional murder, and took that into consideration in advising Joubert to plead guilty.

Joubert now claims his trial attorneys were ineffective in advising him to so plead as a combined result of the dynamics arising from his attorneys' lack of experience and inability to get along with each other, their failure to develop evidence in support of a change of venue, their failure to obtain a ruling on their motion to suppress his confession, their failure to somehow extract a guarantee that the death penalty would not be invoked, and their failure to file and litigate every possible motion. We review each of these claims in turn.

### (i) Attorney Dynamics

Joubert's claim that his attorneys were deficient in part by advising him to plead guilty because they were inexperienced and did not get along with each other leads to no meaningful

analysis. As the U.S. Supreme Court observed in *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), while a particular lawyer's level of experience may shed light on his or her performance, it is the lawyer's performance that must be evaluated. The same is true with respect to the nature of the relationship between lawyers who worked together; the question is not how well they got along, but how well they performed their function.

We note that as to the matter of performance, a number of attorneys testified at the postconviction hearing to a variety of opinions concerning what Joubert's trial attorneys should or should not have done. Expert testimony must be such as to assist the trier of fact to understand the evidence or to determine a fact in issue. Neb. Rev. Stat. § 27-702 (Reissue 1989). The question of whether counsel performed in accordance with the test set out in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), is a legal matter concerning which judges are required to be their own experts; judging the law is one of the more important judicial functions. Thus, expert evidence is generally not admissible as proof that the assistance of counsel in a criminal case was ineffective. *State v. Gagliano*, 231 Neb. 911, 438 N.W.2d 783 (1989); *State v. Ohler*, 219 Neb. 840, 366 N.W.2d 771 (1985). It is true that in a postconviction action decided after *Ohler* and before *Gagliano*, *State v. Meis*, 223 Neb. 935, 395 N.W.2d 509 (1986), we, without comment, noted the testimony of an attorney concerning what he would have done with respect to the State's closing argument at trial. A close reading of the opinion reveals, however, that the analysis would have been the same had we ignored the attorney's testimony. The fact is that the expert evidence in this case adds nothing of probative value to the record.

Having determined that no useful purpose would be served by a detailed review of the level of experience attained by Joubert's attorneys or of their interpersonal relationships, we move on to Joubert's other concerns.

### (ii) Venue Motion

Joubert asserts that he was denied effective assistance of

counsel in part by virtue of his attorneys' advice to plead guilty before the trial court had ruled on his motion for a change of venue and in part by his attorneys' failure to present more evidence, including a public opinion poll, in support of that motion. In denying Joubert relief on this issue, the postconviction judge found that the venue motion would have been "held under advisement, or denied without prejudice to renewing it, until an attempt was made to impanel a jury in Sarpy County . . . even if defense counsel had submitted a public opinion poll in support of the motion."

In accordance with the reasoning adopted in earlier cases, this court, in *State v. Boppre,* 234 Neb. 922, 453 N.W.2d 406 (1990), recently held that compared to a public opinion poll, voir dire examination is the better, more probative forum for ascertaining the existence of community and individual prejudice or hostility toward an accused and that it was not error for the trial court in that case to refuse to grant a motion for a public opinion poll. Similarly, Joubert's attorneys did not perform deficiently in electing not to conduct a public opinion poll.

Furthermore, as found by the postconviction court, Joubert has failed to show how a ruling on his venue motion would have affected his pleas. Before Joubert pled, the trial court stated that if an impartial jury could not be impaneled in Sarpy County, the motion would have then been considered. Joubert, like all defendants, was assured of an impartial jury wherever his trial was held. Thus, it cannot be said that his decision to plead guilty, or the outcome of a trial, had one been held, would have been affected by a ruling on the change of venue motion.

### (iii) Motion to Suppress Confession

Joubert places great emphasis on his trial attorneys' failure to insist upon a ruling, before he pled, on his then pending motion to suppress the confession he gave to the police.

The circumstances surrounding this aspect of Joubert's pleas are detailed in *Joubert I* and will not be reiterated in detail here. It is sufficient to note that the trial court, in an effort to avoid pretrial publicity which would adversely affect its ability to impanel an impartial jury, refused to conduct a hearing on the

suppression motion until after a jury had been selected. In determining to so handle the matter, the trial court stated that Joubert could enter his guilty pleas and still have the option of having the court hear his motion to suppress. The trial court further stated that if Joubert succeeded in suppressing his confession, he would then be allowed to withdraw his pleas of guilty. Nonetheless, when it actually accepted the pleas, the trial court asked Joubert:

> [D]o you understand there is a motion pending to suppress statements or confessions that you had allegedly made at the time of your arrest? Do you understand that if I accept the pleas of guilty, that that motion likewise is gone and you can never raise that again as an issue?

Joubert replied, "I understand."

In this postconviction proceeding Joubert testified that when he pled guilty, he was not aware of the option to be heard on the motion to suppress after he entered his guilty pleas. Giles also testified he was unaware of that option. However, Miller testified that he had informed Joubert of the option, and the postconviction court accepted Miller's version of the facts on this question.

Whatever might be said of the manner in which the suppression motion was handled becomes unimportant if the confession was not suppressible. In that connection, we bring to mind this court's observation in *Joubert I* that "it was difficult to imagine" what evidence could have been presented which would have convinced the trial court to suppress the confession. In now recycling this issue, Joubert presents nothing which supports a determination that his confession was made other than freely, voluntarily, intelligently, and understandingly and free of any promises or inducements.

Not only did the trial court's colloquy with Joubert, as reported in *Joubert I*, establish that he was fully aware of the rights afforded him by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), but the confession itself establishes that Joubert was aware of those rights. The confession reveals that Joubert knew he was talking with police authorities, that he had the right to remain silent, that anything he said would be used against him in a court of law, that he had

the right to have an attorney present during questioning, and that if he could not afford an attorney, the court would appoint one for him. The confession also reveals that with full knowledge of those rights, Joubert elected to expressly waive the presence of an attorney. He further expressly acknowledged his willingness to make statements to the police. The confession also discloses that Joubert had not, in the 24 hours preceding the confession, ingested either alcohol or other drugs and that he had eaten within the preceding 2 or 3 hours. At the commencement of the confession Joubert acknowledged that he had been neither coerced nor threatened, nor had he received any promises.

The confession was obtained constitutionally and therefore, as the postconviction judge determined, was not suppressible. Consequently, the failure of Joubert's attorneys to insist that the suppression motion be ruled upon before permitting him to plead, if professionally deficient, a matter we do not decide, resulted in no prejudice.

### (iv) Motion to Suppress Identification

Joubert further claims that his trial attorneys performed deficiently in failing to call unnamed witnesses to testify about the "line up wherein [Joubert] was identified." Brief for appellant at 6.

The record reveals that Joubert's attorneys filed a motion to suppress, on a variety of grounds, any pretrial and courtroom identification of Joubert by sundry persons endorsed as witnesses by the State. After an evidential hearing, the trial judge overruled the motion with the proviso that if the State were to call a particular witness who had been hypnotized, the State would have to show that such witness' recollection was on a basis independent of the hypnosis.

Joubert does not tell us what the unnamed witness would have said. He only argues that the step was necessary to determine if any evidence of police misconduct with respect to the lineup procedures could be discovered. The rule, however, is that a claim of prejudice based upon counsel's failure to call witnesses is not sustained in the absence of evidence as to what the witnesses' expected testimony would be. *State v. Hill*, 214

Neb. 865, 336 N.W.2d 325 (1983). Furthermore, no claim is made, nor does the record show, that there were any witnesses to the crimes. Given that circumstance and the completeness of Joubert's confession, we are unable to discern how any identification of him could materially affect the certainty of his conviction had he gone to trial, nor his decision to plead guilty.

### (v) Life Guaranty

Next, Joubert contends, in effect, that it is a per se violation of a defendant's right to effective assistance of counsel if he is advised to plead guilty when the imposition of the death penalty is possible. He urges the view that a defendant in a first degree murder case should be advised to plead guilty only if the criminal justice system has been so manipulated as to make imposition of the death penalty impossible, such as would be the case, for example, if the prosecutor were to agree, properly or improperly, to refrain from adducing at the penalty phase of the trial any evidence of aggravating circumstances.

While those personally opposed to the death penalty may espouse this approach, it is apparent that such is not the law. See *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), a case in which the defendant was sentenced to death after pleading guilty to three counts of murder. See, also, *Post v. Ohio*, 484 U.S. 1079, 108 S. Ct. 1061, 98 L. Ed. 2d 1023 (1988) (Marshall, J., dissenting) (certiorari denied in case wherein defendant was sentenced to death by a three-judge panel after entering plea of no contest to charges of aggravated murder and aggravated robbery).

It is interesting to note that the late Clarence Darrow, an attorney whose advocacy was generally considered to be quite effective, found it appropriate to advise his clients to plead guilty in the case of the State of Illinois v. Nathan Leopold, Jr., and Richard Loeb before the criminal court of Cook County, notwithstanding that imposition of the death penalty was possible. See, *Clark v. United States*, 259 F.2d 184 (D.C. Cir. 1958) (Burger, J., dissenting); *United States v. Perez-Casillas*, 593 F. Supp. 794 (D. Puerto Rico 1984).

### (vi) Other Possible Motions

Joubert's final complaint with respect to this summarized

assignment of error is that his trial attorneys were ineffective because they failed to file and litigate "every motion of even questionable merit." Brief for appellant at 25. He, however, does not identify what motions his attorneys should have filed. Neither does the record reveal any basis for unfiled motions of arguable merit. What the record does reveal is that his trial attorneys filed 27 motions on Joubert's behalf. Contrary to Joubert's suggestion that his attorneys were dutybound to engage in defense efforts predestined to fail, we have held that "[n]o incompetence or prejudice can be implied by trial counsel's failure to do that which ought not be done." *State v. Hunt*, 212 Neb. 304, 307, 322 N.W.2d 624, 628 (1982).

(c) Resolution of Assignment

Since each of Joubert's claims of his trial attorneys' ineffectiveness is without legal merit, those claims neither individually nor in combination with each other support the assertion that his trial attorneys were ineffective.

The reality is that Joubert's trial attorneys were faced with what could only appear to any reasonable attorney as the certain conviction of their client, and thus opted to limit, as best they could, the evidence of aggravating circumstances which the State could present and thereby lessen the possibility that Joubert would be sentenced to death. While hindsight has proven that strategy to be unsuccessful, it was nevertheless the product of reasonable professional judgment.

### 3. Victim Impact Statements

In the third and last summarized assignment of error, Joubert argues that his sentence is constitutionally infirm because the panel of judges who sentenced him received in evidence victim impact statements in the form of letters from the parents of Joubert's victims. Regarding these letters, the sentencing panel stated the following: "To the extent these letters have provided a catharsis for those writing them, we acknowledge receiving and reading them. Nevertheless, these letters have no probative value or weight in our determinations . . . ." Joubert nonetheless argues that receipt of the documents in evidence requires that his sentence be reversed, citing *Booth v. Maryland*, 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 440

(1987). Joubert's reliance on *Booth* is clearly misplaced.

*Booth* involved a Maryland statute which required the Maryland State Division of Parole and Probation to compile a presentence report which, in all felony cases, included a victim impact statement describing the effect of the crime on the victim and the victim's family. The U.S. Supreme Court determined that it was improper for a jury to consider such victim impact statements in a capital sentencing decision.

Even if we ignore the differences between the nature of an impact statement prepared by a professional under statutory mandate and letters from the parents of the victims, *Booth* is nonetheless distinguishable from this case in that the sentence in *Booth* was imposed by a jury of laypersons and, here, the sentences were imposed by a panel of jurists. Indeed, the U.S. Supreme Court had an opportunity to extend the *Booth* holding to a situation involving judge sentencing in *Post v. Ohio*, 484 U.S. 1079, 108 S. Ct. 1061, 98 L. Ed. 2d 1023 (1988), and refused to do so by denying certiorari. The situation is no different than that presented in a bench trial where the judge suppresses a confession, presides over the trial, and then imposes sentence. The fact that a judge reviews a confession does not disqualify him from continuing to preside over the remaining phases of the trial. This is so because it is presumed that judges disregard evidence which should not have been admitted. *State v. Sheridan*, 230 Neb. 979, 434 N.W.2d 338 (1989); *Wells v. State*, 152 Neb. 668, 42 N.W.2d 363 (1950). The panel in this case specifically declared that it was acting in accordance with the presumption.

We are not unmindful that recently in *State v. Reeves*, 234 Neb. 711, 453 N.W.2d 359 (1990), we reasoned that *Booth* did not control the result therein because it was not to be applied retroactively. *Reeves* employs a correct alternative analysis which appropriately disposed of the issue under the facts of that case. However, the broader analysis required by the facts of this case provides an alternative which would have led to the same result as the narrower analysis employed in *Reeves*.

There is no merit to the third summarized assignment of error.

## III. DECISION

The record failing to support any of the summarized assignments of error, the judgment of the postconviction judge is affirmed.

AFFIRMED.