STATE OF NEBRASKA, APPELLEE, V. JIMMIE LEE WILLIAMS, APPELLANT.

480 N.W.2d 390

Filed February 14, 1992.   No. 90-525.

986

James A. Wagoner for appellant.

Don Stenberg, Attorney General, Mark D. Starr, and, on brief, Susan M. Ugai for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Following a trial by jury the defendant, Jimmie Lee Williams, was convicted of the April 22, 1989, first degree murder of Richard Dale Kinikin, as well as a second count of use of a weapon to commit a felony. He was sentenced to a term of life imprisonment, as well as a consecutive term of $6^{1}/_{2}$ to 20 years on the second count. Defendant has appealed to this court, assigning 17 alleged errors, which may be combined to constitute the following: (1) insufficiency of the evidence, (2) testimony of defendant's spouse in violation of spousal immunity, (3) failure to grant defendant's request for change of venue, (4) failure to sustain defendant's challenge for cause of a juror, (5) failure to grant defendant six extra peremptory challenges, (6) errors in the admission of evidence, (7) error in giving an instruction regarding self-defense, and (8) error in considering victim impact information during the sentencing phase of trial. We affirm.

Although the testimony of the various witnesses is contradictory to some degree, there appears to be no reasonable doubt that defendant deliberately and with premeditation shot and killed Kinikin.

Defendant was proceeding westerly on Interstate 80 in his tractor-trailer unit, which was then being driven by his wife. He got into a conversation over his CB radio with another truckdriver, which was described as degenerating into a "cuss fight." Defendant testified that the voice on the other radio stated, "I got a mind to make you put that big old blue freight shaker [truck] in the ditch." He also testified that he, the defendant, said, "I got a good mind to have my wife just come on, go around you and you can take your garbage mouth somewhere else." The other driver, or the other voice on the CB, was said to have stated, "You come on up here and if you are still sitting there in that seat . . . I'll blow a hole in you."

Defendant then testified that he got his rifle from behind the

seat and said over the radio, "You are not going to hurt me. I am not going to let you. You just go on." He then asked his wife to pull over and stop.

The testimony of defendant's wife differed somewhat from that of her husband. She testified that defendant "was just like . . . egging him [the other driver] on. . . . He wanted the truck driver to answer him . . . and the truck driver wouldn't answer him." The other driver finally responded by telling the defendant that "he was supposed to get in the back of the bunk . . . ."

Williams' truck stopped behind that of Kinikin. Defendant testified that Kinikin walked around the front of his truck and stopped at the passenger side. Kinikin then opened the passenger side door and reached inside. While Williams started to get out of his truck, he saw Kinikin stick something in the back of his pants. It looked to Williams like Kinikin was tucking the object between his body and his "britches." Kinikin then reached up, pushed the latch down on the door, shut it, and walked toward Williams' truck. Williams could not see what Kinikin had put in his pants, but defendant thought it was a weapon.

Defendant testified that when he got out of his truck, he was wearing on his feet his white socks without his boots. Kinikin was shaking his left finger at Williams while walking toward him, having his other hand clenched at his side. Williams said he became frightened and tried to load his rifle. After a few seconds, he was able to put a cartridge in the chamber. Williams then put the gun up to his shoulder and pointed it at Kinikin.

Kinikin then stopped walking toward Williams, according to defendant. Kinikin looked at Williams for a second and said, "Now, we'll see," which caused Williams to jump back. Defendant said Kinikin appeared angry and shouted. Williams then stated that he realized that this voice belonged to the man with whom he had had the "cuss fight" over the radio. According to Williams, Kinikin reached behind his back with his right hand. Williams reacted by stepping backward, bringing the gun upward, and shooting Kinikin. After Williams had pulled the trigger, he got back in his truck and told his wife to go.

Williams' wife testified that she did not see anything in Kinikin's hands. She saw her husband put a bullet in the rifle. Defendant then put the rifle to his shoulder and fired. When Williams came back to the truck, his wife said, "My God, did you have to shoot him?" The defendant did not respond to that question, but later told her that "[t]hat was the stupidest thing I ever did."

The defendant's wife also testified that he instructed her as to the story they would tell if stopped by the police. In the main it consisted of a recitation that he was asleep in the bunk, that she started to pull over behind Kinikin's truck to help a truckdriver who was stopped on the side of the road, but that defendant told her not to stop, so she therefore pulled back onto the highway.

There were several other witnesses whose testimony pointed to the killing of Kinikin by Williams. Kinikin died of the gunshot wound, according to the testimony of a pathologist.

In determining the sufficiency of the evidence to support a finding of guilt in a criminal case, this court does not resolve conflicts in the evidence, determine the plausibility of explanations, or weigh the evidence. Those matters are for the finder of fact, whose findings must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support them. *State v. Laymon, ante* p. 80, 474 N.W.2d 458 (1991).

On a claim of insufficiency of the evidence, the Supreme Court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may the Supreme Court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Laymon, supra.*

The evidence, even limiting it to the testimony of the defendant himself, supports a finding of guilty beyond a reasonable doubt.

The defendant assigns error to the overruling of his objection to the testimony of his wife. There was no error in admitting that testimony. Neb. Rev. Stat. § 27-505 (Reissue 1989) provides in part as follows:

(2) During the existence of the marriage, a husband and

wife can in no criminal case be a witness against the other. This privilege may be waived only with the consent of both spouses.

(3) These privileges may not be claimed:

(a) In any criminal case where the crime charged is a crime of violence . . . .

Defendant questions the validity of that statute, alleging it is unconstitutionally vague. He concedes that in *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986), *cert. denied* 484 U.S. 872, 108 S. Ct. 206, 98 L. Ed. 2d 157 (1987), this court held that the phrase "crime of violence" is not vague in the context of § 27-505, but apparently asks this court to overrule *Palmer*. We decline to do so. This assignment of error is without merit.

Williams claims that prejudicial publicity in Hamilton County "prevented him from receiving a fair trial by an impartial panel." Brief for appellant at 28. Specifically, Williams argues that he was entitled to a change of venue because of the sheer number of venirepersons admitting knowledge of the case from the media, because he was "newsmaker of the year in the arena of trial," because he was "unfairly drawn into disputes regarding Sheriff treatment of prisoners and cost of trial," and because he was "prejudicially associated with the Co-Defendant's [defendant's wife] admission of guilt." *Id.*

"Due process [under the 14th Amendment] requires that the accused receive a trial by an impartial jury free from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). In any individual case, the observance of this guarantee is evaluated in light of the totality of the circumstances of the case. See *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975).

The fact that many, most, or even all of the jurors knew something about the case in advance would not entitle Williams to a change of venue. The U.S. Constitution does not guarantee a criminal defendant a jury totally ignorant of the facts and circumstances of his or her case. *Murphy v. Florida, supra* at 421 U.S. at 799-800 ("[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved"). A venireperson is qualified to sit on the jury, even where he has previous

knowledge of the case, if he " 'can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " 421 U.S. at 800 (quoting *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961)).

Only one of 40 venirepersons—and no one actually seated on the jury—expressed any reservation about her ability to decide the case solely on the evidence, and Williams' challenge for cause to that venireperson apparently was not upon that ground. Williams points to nothing in the record indicating that any particular juror was biased, and an independent review of the record does not disclose actual partiality.

It is true that "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984). Partiality may be presumed only in situations where "the general atmosphere in the community or courtroom is sufficiently inflammatory." *Murphy v. Florida, supra* at 421 U.S. at 802.

*Sheppard v. Maxwell, supra*, while involving extensive pretrial print publicity such as Williams claims existed in this case, required more than just that publicity in order to create the presumption of juror prejudice. *Sheppard* involved a highly publicized criminal case—the trial of Dr. Sam Sheppard for the alleged murder of his wife. The pretrial publicity in the case included repeated assertions that Sheppard had refused to take a lie detector test; detailed allegations of Sheppard's marital unfaithfulness; accusations that Sheppard, his family, and his lawyers were "stalling" the investigation; and editorial calls for further investigation and for Sheppard's arrest and prosecution. Most of the courtroom space was assigned to the press corps members, whose presence hindered orderly proceedings; testimony and photographs of exhibits were published daily during the trial, in which jurors were not sequestered; and the prosecution disclosed certain anticipated testimony, which was repeated in the press, that failed to materialize at trial. The Court held that this "totality of circumstances" was " 'inherently lacking in due process,' " and did not require " 'a showing of identifiable [juror]

prejudice to the accused.' " 384 U.S. at 352.

In *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963), the defendant in a capital murder case was interrogated by the local sheriff and confessed to the crime in a film which was broadcast three times and viewed by no less than 53,000 of the 150,000 people in the parish in which he was tried and convicted. The Court did

> not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised "interview."

373 U.S. at 727. *Estes v. Texas*, 381 U.S. 532, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965), addressed a situation of the pervasive intrusion of television into a criminal trial. A pretrial hearing on motions to restrict media coverage and for a continuance was broadcast on television. At least 12 cameramen were present in the courtroom, and the courtroom was cluttered with television equipment and microphones. Portions of the trial were broadcast live, and the entire trial was filmed by cameras in a large booth at the back of the courtroom. The Court found that the intrusion of the press into the proceedings threatened the "solemn purpose of endeavoring to ascertain the truth which is the *sine qua non* of a fair trial," 381 U.S. at 540, and reversed the conviction.

The pretrial publicity of which Williams complains included articles from the Aurora News-Register, the Grand Island Daily Independent and the Grand Island Sunday Independent, and the Omaha World-Herald, all newspapers of general circulation in Hamilton County. These stories consisted predominantly of news articles detailing Kinikin's death, the subsequent investigation, the arrest of Williams and his wife, and the pretrial court proceedings, including defendant's motion for a change of venue. Another news item contained a "[y]ear end review" article from the News-Register, consisting of a photo of Williams in handcuffs and leg irons being led by a uniformed peace officer, along with two brief paragraphs relating that the Nebraska State Patrol was searching for a "blue semi truck

tractor with an anteater cab" and that Williams had been arrested "in connection with" Kinikin's death. There was also a News-Register article regarding a budget dispute between the Hamilton County Board and the county sheriff, containing a brief reference to the cost of Williams' pretrial detention and upcoming trial. Additionally, there was an article reporting Williams' wife's plea of guilty to the accessory charge, under the headline "Williams enters plea of guilty."

The trial court reserved ruling on Williams' pretrial motion for a change of venue until after voir dire. The court later noted that the evidence adduced at the hearing on the motion, standing alone, "[would] not support a finding in favor of the defendant on this motion."

The record in this case discloses none of the yellow journalism, investigatorial bias, or prosecutorial misconduct evident in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). Neither was Williams televised confessing to the crime of which he was accused, as in *Rideau*, nor does the record reveal any intrusion of the electronic media into the court proceedings, as in *Estes*.

Nor does the publicity given Williams approach the level of that found in *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961), in which the Supreme Court presumed juror bias arising solely from pretrial publicity. In that case, six murders had been committed in the Evansville, Indiana, area. Media coverage of the crimes—which extended into Gibson County, where Irvin was ultimately tried—included "curbstone opinions" as to Irvin's guilt and the appropriate punishment; "a barrage of newspaper headlines, articles, cartoons, and pictures [in newspapers] delivered regularly to approximately 95% of the dwellings in Gibson County," 366 U.S. at 725; radio and television newscasts detailing Irvin's criminal history; police lineup identification of Irvin; the fact that Irvin had taken a lie detector test; Irvin's confession to all six of the Evansville area murders; and his offer, rejected by the state, to plead guilty to avoid a death sentence.

Williams stresses the news article mentioning him in the context of the intragovernmental budget dispute and the headline "Williams enters plea of guilty." Neither of these items

is of the kind found in *Irvin* to be predicative of presumed prejudice. Williams fails to explain how jurors might be predisposed to believe he is guilty just because it cost the county money to detain him before trial. Common sense would tell any juror in a case where the defendant was held before trial that such incarceration costs the government money. Likewise, common sense would tell any venireperson or potential venireperson in the courtroom before Williams' trial that since he was proceeding to trial, Jimmie Lee Williams was not the "Williams" who had pleaded guilty. Furthermore, the jury's extrajudicial knowledge that a codefendant has pleaded guilty is not in and of itself grounds to presume juror prejudice. See, *U.S. v. De La Vega*, 913 F.2d 861 (11th Cir. 1990); *U.S. v. Beniach*, 825 F.2d 1207 (7th Cir. 1987); *United States v. Martin*, 740 F.2d 1352 (6th Cir. 1984).

The pretrial publicity in this case did not rise to the level of that in *Irvin*, such as would compel a presumption of juror partiality. This conclusion is supported by the recent analysis of the U.S. Supreme Court in *Mu'Min v. Virginia*, ＿＿＿ U.S. ＿＿＿, 111 S. Ct. 1899, 114 L. Ed. 2d 493 (1991). Mu'Min was a prisoner serving time for a previous murder, accused of murdering a woman while on prison work release. Press reports focused on the negligence of prison officials such as would have allowed Mu'Min to escape and commit the murder. Additionally, "a great deal of . . . media coverage . . . was devoted to Mu'Min and the details of his crime." 111 S. Ct. at 1910 (Marshall, J., dissenting.) Specifically, local media disclosed that the victim was "discovered in a pool of blood, with her clothes pulled off and semen on her body," 111 S. Ct. at 1911 (Marshall, J., dissenting); that Mu'Min returned to the prison work detail and had lunch after the crime; that Mu'Min, a "murderer," had confessed to the crime; that Mu'Min had had disciplinary problems in prison, including allegations that he beat another prisoner; and that a fellow inmate described Mu'Min as a " ' "lustful" ' individual who did ' "strange stuff." ' " *Id*. While Mu'Min did not claim presumed juror prejudice, the majority of the Court compared the publicity in his case unfavorably to that in *Irvin v. Dowd, supra*, in determining that he was not constitutionally entitled to voir dire

questions regarding the content of pretrial publicity to which venirepersons had been exposed.

The publicity in *Mu'Min* was far more inflammatory and prejudicial to that defendant than anything Williams presents in support of his claim of error, yet the U.S. Supreme Court in *Mu'Min* made it clear that the publicity there fell on the other side of the presumed prejudice line from the publicity in *Irvin*. This further compels the conclusion that Williams had no constitutional right to a change of venue.

Under Nebraska law, venue in a criminal case can be transferred on the defendant's motion where "it shall appear to the court . . . that a fair and impartial trial cannot be had" in the county in which the crime was committed. Neb. Rev. Stat. § 29-1301 (Reissue 1989). The factors to be considered in determining whether a change of venue is required due to pretrial publicity include the nature of the publicity, the degree to which the publicity has circulated in the areas to which venue could be changed, the length of time between the dissemination of the publicity complained of and the date of trial, the care exercised and ease encountered in selection of the jury, the number of challenges exercised during voir dire, the severity of the offenses charged, and the size of the area from which the venire is drawn. *State v. Red Kettle, ante* p. 317, 476 N.W.2d 220 (1991). "A trial court's ruling on a motion for change of venue will not be disturbed absent an abuse of discretion." *State v. Boppre*, 234 Neb. 922, 935, 453 N.W.2d 406, 419 (1990).

The publicity in this case was exclusively factual. Indeed, most of the publicity did not reveal any of the evidence to be adduced against Williams at trial. There were no editorial expressions of hostility or animosity toward Williams. The nature of the publicity does not compel a change of venue. See, *State v. Boppre, supra* (news accounts which are factual and do not reveal hostility or animosity to the defendant do not serve as a basis for a change of venue); *State v. Jacobs*, 226 Neb. 184, 410 N.W.2d 468 (1987) (factual news accounts reporting the occurrence of crime, one defendant's call for an ambulance, the charging of defendants, and the appointment of special prosecutor did not furnish a basis for change of venue); *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986) (factual newspaper

articles reporting the killing, the defendant's arrest and bond hearing, the personal history of parties, and the funeral date of victim did not require change of venue).

Most of the news coverage of the Kinikin killing was distant in time from Williams' trial. Of all the news articles offered into evidence in support of Williams' motion, only two appeared within 3 months of the trial. One of these was the year end review feature in the Aurora News-Register on January 3, 1990. It contains a photo of Williams in handcuffs and leg irons and the following passages:

APRIL

. . . .
—The Nebraska State Patrol was searching for a blue semi truck tractor with an anteater cab inconnection [sic] with the death of a 42-year-old Arkansas struck [sic] driver who was shot along busy Interstate 80 in Hamilton County east of Aurora.

MAY

. . . .
—Hurley, S.D., truck driver Jimmie Lee Williams, 49, was arrested near Houston, Texas, in connection with the death of trucker Richard Dale Kiniken [sic] on Interstate 80 in April.

The other article appeared in the Aurora News-Register on February 28, 1990, and detailed Williams' pretrial motions for change of venue and to exclude, in limine, testimony regarding the incident reconstruction. It is significant that the articles Williams singles out as most prejudicial—the one involving the county board dispute and the one bearing the "Williams enters plea of guilty" headline—appeared on November 22, 1989, and June 14, 1989, respectively, 3½ and 9 months before the trial. See *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990) (change of venue not warranted where only five articles appeared in the 4 months immediately preceding trial).

The record of the voir dire examination details the care taken and ease had in seating jurors, and does not support Williams' assignment of error in this regard. Although as many as 35 of the 40 venirepersons called in the case had been exposed to media accounts, only one professed an inability to put what she

had read or heard aside, and she was excused for cause. Four of the jurors actually sworn to serve were specifically questioned about publicity; all either had not formed opinions or were willing to set their opinions aside. In light of these reassurances, the failure to grant a change of venue was not an abuse of discretion. See *State v. Boppre, supra.*

Williams claims error in that the trial court failed to sustain his cause challenge as to certain venirepersons. The only argument offered in support of this assignment is the repetition of the assignment with a citation to the bill of exceptions at page 190, line 12, where Williams challenged venireperson Hansen. However, following Hansen's statement that he could be fair and impartial, Williams did not renew his cause challenge or insist on a ruling on his earlier challenge. Failure to insist on a ruling on an objection waives the objection. *State v. Nowicki, ante* p. 130, 474 N.W.2d 478 (1991). Logic dictates that the same principle would apply to a failure to insist on a ruling on a challenge for cause. The most logical inference from the defendant's silence is that he was satisfied that the juror had rehabilitated himself by professing his impartiality, and the defendant was withdrawing his challenge.

Williams was granted 12 peremptory challenges. Neb. Rev. Stat. § 29-2005 (Reissue 1989) grants that number of challenges to a defendant charged with a crime punishable by death or imprisonment for life. However, he now claims that he should have been awarded six additional challenges, for the count charging him with use of a weapon in the commission of a felony.

The defendant makes much of the fact that the charge of use of a weapon was not part of the original complaint. However, he ignores the fact that the joinder of the two counts took place by means of the filing of the second amended complaint before any proceedings were had in the case. Williams also ignores the law of joinder in Nebraska, which focuses not upon the procedural aspects of the individual charges, but upon whether the separate offenses charged arose from the same transaction. See Neb. Rev. Stat. § 29-2002(1) (Reissue 1989). The murder count and the use of a weapon to commit a felony were properly joined because they arose out of the same act or transaction,

and it is wholly irrelevant to the issue of the propriety of their joinder whether the documents charging each offense were filed separately or contemporaneously.

Where, as here, two or more offenses are properly joined, a trial court does not err in limiting the defendant to the number of peremptory challenges statutorily available for the most serious of the offenses. "[A] defendant is not entitled to additional peremptory challenges because the indictment charges separate offenses in separate counts." *State v. Benzel*, 220 Neb. 466, 475, 370 N.W.2d 501, 509 (1985).

Williams assigns as error the admission of exhibits 13, 18, 19, 21, 23, 29, 30, 31, and 32. The only meaningful argument made in support of the assignment of error relates to exhibit 13, the T-shirt Kinikin was wearing when he was killed. With regard to the other exhibits, Williams simply asserts that "no foundation or relevance was made prior to their respective evidentiary introduction." Brief for appellant at 31.

The assignment of error with regard to the other exhibits is not properly presented in this court. Williams' entire argument in this respect is as follows:

Likewise, Appellant objects to the introduction of Exhibits 18, 19, 21, 23, 29, 30, 31, and 32 as no foundation or relevance was made prior to their respective evidentiary introduction [citations to bill of exceptions for location and admission of each exhibit]. *United States v. Blackburn*, 389 F.2d 93 (6th Cir. 1968).

Brief for appellant at 31. "This court will not consider assignments of error which are not discussed in the brief." *State v. Spiegel, ante* p. 233, 234, 474 N.W.2d 873, 875 (1991).

Even if Williams had properly presented his arguments about foundation and relevance, there was no error in receiving the exhibits in evidence. Exhibit 21 was identified by the State's firearms expert as a "British .303 No. 4 Mark I rifle," which, defendant's wife testified, "look[ed] exactly like the gun" Williams had. She testified that she was present when he purchased the gun and that the serial number on the rifle he bought was 13592, which agreed with the serial number on the exhibit.

Exhibit 23 was identified by the expert as a box of

ammunition for the rifle, which, defendant's wife testified, had come from her and Williams' house and which she had mailed to the State's investigator.

Exhibits 18 and 19 are photos of the Shelton-Kenesaw exit off Interstate 80. Defendant's wife testified that she pulled the truck off the Interstate at the exit depicted in the photographs, and the State's investigator testified that the photos showed the exit and the location of the rifle when he found it.

Four of the exhibits, 29, 30, 31, and 32, were relevant because they showed where the rifle was found and the condition it was in at the time and were properly identified by the State's investigator.

Finally, exhibit 13, Kinikin's T-shirt, was not received solely to "inflame the passions of the Jury as it contained no probative evidentiary force," as Williams contends. Brief for appellant at 31. Rather, it showed the entry and exit sites of the bullet. Also, when considered along with the State's investigator's testimony, it served to show the distance at which the fatal shot was fired and tended to negate Williams' self-defense claim. The investigator testified that the rifle deposited powder and lead on a cloth surface when he test fired it at that surface at a distance of 4 feet or less. He further testified that he tested the T-shirt for powder and lead residue and found none. The T-shirt was evidence that the shot that killed Kinikin was fired from more than 4 feet away.

Error is assigned in the giving of the following, instruction No. 17, relating to the claimed defense of self-defense:

An element in this case is that the defendant did not act in self-defense. The defendant did not act in self-defense if the state proved beyond a reasonable doubt that any one of the following did not occur:

(1) Richard Dale Kinikin threatened serious bodily harm; or,

(2) The defendant neither consented to any such use of force against him nor provoked any such use with the intent of using deadly force in response; or,

(3) The defendant reasonably believed that his use of deadly force was immediately necessary to protect him against serious bodily harm; or

(4) Before using deadly force the defendant either tried to get away or did not try because he reasonably did not believe he could do so in complete safety.

The fact that the defendant may have been wrong in estimating the danger does not matter so long as there was a reasonable basis for what he believed and he acted reasonably under the circumstances as they existed at the time.

In considering claimed error regarding an instruction, " '[a]ll of the instructions given must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating a reversal.' " *State v. Johnson*, 236 Neb. 831, 842, 464 N.W.2d 167, 175 (1991).

Williams argues that instruction No. 17 misstates the law in two ways. First, he argues that the controlling statute, Neb. Rev. Stat. § 28-1409 (Reissue 1989), requires that self-defense be evaluated from the defendant's point of view, whereas instruction No. 17 compels the jury to evaluate the evidence of what the "other person" (in this case Kinikin) did. Second, he argues that subparagraph (4) of instruction No. 17 requires that the defendant attempt retreat, whereas § 28-1409 requires only that the defendant reasonably believe he could retreat in safety and does not require the defendant actually to attempt retreat. Additionally, he argues that the instruction is constitutionally infirm in that it shifts the burden of proving self-defense onto him and in that it is vague in its use of double negative language.

Defendant's first argument regarding whose point of view is important fails upon a full reading of the instruction. Whether Kinikin threatened Williams with serious bodily harm must be viewed in the eyes of the beholder—the last paragraph of the instruction permits the defendant to have been wrong in estimating his danger as long as there was a "reasonable basis for what he believed."

The instruction did not require the jury to find that Williams attempted to retreat. It merely required that defendant either tried to retreat *or* did not try because he (defendant) reasonably did not believe he could do so in complete safety.

The instruction of which complaint is made did not shift the burden of proving self-defense onto the shoulders of the defendant. Any hint that instruction No. 17 suggests such a position is nullified by instruction No. 7, which defines as an element of the charged offense of first degree murder, and of the lesser-included offenses of second degree murder and manslaughter, that "[Williams] did not act in self-defense when he killed Richard Dale Kinikin," and places upon the State the burden of proving each element beyond a reasonable doubt, which elements include the element of "no self-defense."

Williams' argument that the instruction is vague because it employs double negative language is without citation to authority and without meaningful exposition. Defendant simply states that the instruction is capable of "more than a single construction." Brief for appellant at 26. He does not suggest what alternative construction might be reached. A plain reading of the instruction shows that it is not vague or misleading. While it is drafted in negative rather than affirmative terms, this style is necessary in order to preserve the proper placement of the burden of proof. Read as a whole and in light of the other instructions, the attacked instruction does not misstate the law, is not misleading, and is not constitutionally infirm, and his assignment as to this instruction is without merit.

Finally, Williams' objection to the use of a victim impact statement is wholly without merit. In the first place, Williams received the minimum sentence, life imprisonment, considering that probation was obviously out of the question. Second, he relies on *Booth v. Maryland*, 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 440 (1987), in which the U.S. Supreme Court held that victim impact statements were not admissible before a jury making a capital sentencing decision. Williams' argument obviously refers to a letter found in the presentence investigation report from a coworker of the victim Kinikin, in which she described him as a hardworking employee who was easy to work with, and she stated he would be greatly missed by his friends and associates.

The State argues that *Booth* is inapplicable to noncapital cases and to sentencing determinations made, as under

Nebraska law, by a judge. See *State v. Joubert*, 235 Neb. 230, 455 N.W.2d 117 (1990). However, we need decide nothing based on *Booth* because that case has been overturned by the U.S. Supreme Court in *Payne v. Tennessee*, _____ U.S. _____, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991).

All of the defendant's assignments of error are without merit, and the judgment of the district court is affirmed.

AFFIRMED.