State of Nebraska, appellant, v.
Philip A. Armstrong, appellee.
___ N.W.2d ___

Filed May 29, 2015.    No. S-14-339.

1.  **Postconviction: Evidence: Witnesses: Appeal and Error.** In an evidentiary hearing, as a bench trial provided by Neb. Rev. Stat. § 29-3001 et seq. (Reissue 2008 & Cum. Supp. 2014) for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in evidence and questions of fact, including witness credibility and weight to be given a witness' testimony. In an appeal involving such a proceeding for postconviction relief, the trial court's findings will be upheld unless such findings are clearly erroneous. In contrast, the appellate court independently resolves questions of law.

2.  **Postconviction: Effectiveness of Counsel.** A postconviction claim that defense counsel provided ineffective assistance generally presents a mixed question of law and fact.

3.  **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

4.  **Effectiveness of Counsel.** A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.

5.  ____. Counsel's failure to raise novel legal theories or arguments or to make novel constitutional challenges in order to bring a change in existing law does not constitute deficient performance.

6.  **Effectiveness of Counsel: Conflict of Interest.** The right to effective assistance of counsel entitles the accused to his or her counsel's undivided loyalties, free from conflicting interests.

7.  **Effectiveness of Counsel: Proof.** To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

8.  **Proof: Words and Phrases.** A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome.

9.  **Effectiveness of Counsel: Conflict of Interest: Presumptions: Proof.** If the defendant shows that his or her defense counsel faced a situation in which conflicting loyalties pointed in opposite directions and that his or her counsel acted for the other client's interest and against the defendant's interests, prejudice is presumed.

10. **Evidence: Witnesses: Corroboration.** Evidence that provides corroborating support to one side's sole witness on a central and hotly contested factual issue cannot reasonably be described as cumulative.

Appeal from the District Court for Sarpy County: Daniel E. Bryan, Jr., Judge. Affirmed.

Jon Bruning, Attorney General, and James D. Smith for appellant.

Gregory A. Pivovar for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, and Miller-Lerman, JJ.

McCormack, J.

## I. NATURE OF CASE

The defendant was charged with sexual assault of two girls he babysat. It was revealed during trial that defense witnesses had viewed forensic interviews of the girls. The State believed this was a violation of the trial court's discovery order and the statute pertaining to victim interviews, Neb. Rev. Stat. § 29-1926(2)(a) and (b) (Reissue 2008). Although defense counsel was unfamiliar with the legal issues surrounding the alleged discovery violation, counsel entered into an agreement with the State to strike the entire testimony of one defense witness and to exclude any testimony from two other defense witnesses. The defendant was convicted. The postconviction court granted the defendant's motion for postconviction relief on the ground that he was deprived of effective assistance of trial counsel. We affirm.

## II. BACKGROUND

Philip A. Armstrong and his wife lived next door to a family with three young children. The family had moved to the Armstrongs' neighborhood in Omaha, Nebraska, in June 2006. The family had twin daughters, M.G. and H.G., born in April 2000, and a younger son. The Armstrongs and their neighbors developed a close relationship. The neighbors' children would often run back and forth between the neighboring yards to visit or play with the Armstrongs.

The neighbors' three children required babysitting Wednesdays after school from approximately 2 until 4 p.m. The children's mother was a teacher at the school the children

attended. The children's original babysitter died of cancer during the spring of 2007. When their first babysitter died, the girls were in first grade and the boy was in preschool.

Armstrong's wife, who was at home due to a work-related injury, began babysitting the children in March 2007 and for the remainder of that school year. During that time, Armstrong was working full time. Armstrong's wife went back to work at a school lunchroom in the fall of 2007. Armstrong had since retired, and arrangements were made for him to pick the children up from school on Wednesdays and watch them until their mother could arrive. Armstrong also agreed to watch the children on Thursdays before school, from approximately 7 to 8:30 a.m.

In July 2008, the girls told their parents that Armstrong had been touching them inappropriately. After an investigation, Armstrong was charged with one count of first degree sexual assault of a child and two counts of third degree sexual assault of a child. Armstrong pled not guilty, and the case was tried before a jury. Armstrong was represented by counsel, who was assisted by cocounsel.

## 1. Trial

### (a) Opening Statements

During opening statements to the jury, the State painted a picture of betrayal by a close family friend and neighbor. The State told the jury that the evidence would show how, during the time of the alleged abuse, the victims' behavior changed. They became angrier. Also, witnesses would show how the girls became increasingly reluctant to spend time with Armstrong.

Defense counsel told the jury in opening statements that defense witnesses would testify that the girls were always happy to spend time with Armstrong. In fact, they often did not want to leave when their mother arrived to pick them up. Defense counsel told the jury that they would hear from Armstrong's family. Defense counsel made specific reference to Armstrong's wife, his daughter, son-in-law, and granddaughter, although counsel did not directly state those persons would testify.

(b) Case in Chief

During the State's case in chief, several witnesses described the girls as being happy when they were in first grade. They loved school. They had adjusted quickly to their move and had made lots of friends.

The girls' parents and school staff described a change in the girls' behavior and mood as they proceeded along in second grade. The girls, especially H.G., seemed preoccupied, more emotional, angry, clingy, and withdrawn. All witnesses agreed that the girls' brother remained happy throughout this time.

H.G. began seeing the school counselor during second grade. The girls' parents explained that M.G. and H.G. had transitioned from a traditional classroom in first grade into a Montessori classroom in second grade. None of the girls' first grade friends or classmates were in the new second grade classroom. A teacher at the school and the principal both testified that this transition normally did not cause great distress. The principal had, in addition, observed that the girls seemed comfortable in their new Montessori classroom. Nonetheless, the girls' parents partially attributed H.G.'s change in behavior to this transition.

The parents also testified that from June 2006 through May 2008, the girls' father occasionally had to be out of town for his job. H.G. described her father as being "gone a lot" during second grade. The girls' father testified that when in town, he worked long hours. In October 2008, the father had to be out of town for a more extended period of time, but visited his family on the weekends.

Witnesses from school noticed a particular change in behavior with regard to the girls' being picked up on Wednesdays by Armstrong. The girls used to run out to meet Armstrong in the beginning of second grade. As the year progressed, the witnesses testified the girls were habitually lagging behind Armstrong when walking to his car. H.G., especially, seemed "sad." The girls' brother continued to seem happy to go with Armstrong.

The girls' mother testified that when she arrived at the Armstrongs' home to pick the girls up, the girls were ready to

go home right away. Often they would go home before their mother was done visiting. The mother said that the girls never stayed at the house after she had gone home.

On cross-examination, the mother admitted that there were other times when the girls would run and hide from her when she arrived to pick them up. H.G. similarly testified that they would sometimes run and hide from their mother or father when they came to pick them up from the Armstrongs' home and that they would sometimes ask to stay a bit longer.

The girls' mother testified that as the girls' second grade year progressed, it was more often than not that Armstrong was alone watching the children when she arrived to pick them up. The girls' mother usually arrived at the Armstrongs' home around 3:30 or 4 p.m. During cross-examination, the girls' mother clarified that Armstrong's wife was there about as often as she was not. She admitted that in her pretrial deposition, she had said Armstrong's wife was "usually" home when she picked the girls up on Wednesday afternoons.

The girls' mother testified that the Armstrongs' grand-daughter, who was living in the Armstrongs' basement during that period of time, was rarely home when the girls were being babysat.

M.G. and H.G. testified that both Armstrong's wife and granddaughter were "sometimes" at the house while they were being babysat.

The girls' mother testified that M.G. would often hang on Armstrong and his wife. Armstrong and his wife were generally affectionate with the girls and their brother and would pick them up, wrestle with them, and tickle them. H.G. testified that she and her siblings liked to jump on Armstrong and play with him. The girls' father testified that up until the day the girls reported the sexual assaults, they seemed to enjoy being with Armstrong and his wife. They wrestled and cuddled with Armstrong and sat on his lap. They demanded attention from both Armstrong and his wife. H.G. testified that she did not like sitting on Armstrong's lap, but that she liked to sit on the lap of Armstrong's wife or granddaughter.

The mother recalled one incident sometime after the middle of the school year when H.G. started kicking and wanted

down when Armstrong picked her up while the girls were playing and the families were together in the backyard. And, at some point, H.G. began saying she was not feeling well on Tuesday nights.

Several witnesses recalled an incident in the summer of 2008, when Armstrong and his son-in-law were handing the girls over the 6-foot fence between the neighbors' yards to their parents. H.G. said to Armstrong, "don't touch my private spot." The girls' mother explained that the girl's comment did not cause her any concern. Armstrong, she said, was incidentally touching H.G.'s bottom in order to get her over the fence.

In late July 2008, the girls' mother had arranged for the Armstrongs to babysit the girls and their brother for the day. As the girls' mother and father were tucking H.G. into bed, H.G. expressed reluctance and agitation when she learned she would be going over to the Armstrongs' house. Because this was not the first time H.G. had expressed reluctance to go to the Armstrongs, her mother began questioning H.G.

Eventually, H.G. disclosed that Armstrong had been sexually abusing her. When H.G.'s mother asked H.G. to demonstrate what Armstrong had done, H.G. sat on her father's lap and rubbed her hands back and forth against her vaginal area. The parents woke M.G. up and had a conversation with M.G. in which she said Armstrong had done similar things to her. The parents thereafter went to the girls' brother, who indicated no awareness of the alleged incidents of abuse.

The girls' mother waited several days before contacting the police. Throughout that week before reporting the matter to the police, the mother asked the girls more questions in order to be certain the girls were not misconstruing what had occurred. The mother testified that she never spoke to the girls about it at the same time and that she tried to keep the conversations neutral and brief.

After the parents reported the disclosure to the police, the girls were interviewed by a forensic interviewer at Project Harmony, a child advocacy center. The forensic interviewer testified at trial as to Project Harmony's protocols that are designed to avoid leading questions or nonverbal cues. The

interviewer described that it is preferable that a qualified forensic interviewer be able to speak to the child victim before the child is questioned by anyone else on the subject of the abuse. The forensic interviewer testified that about 80 percent of child victims do not disclose abuse right away, and she outlined the various reasons why that is the case.

M.G. and H.G. testified at trial. At the time of trial, the girls were 9 years old and starting fourth grade. Both M.G. and H.G. described how Armstrong would rub their vaginal area while sitting in Armstrong's lap watching television. H.G. testified that Armstrong would keep his hand on top of her underwear, but her underwear often "would go inside my baby hole." M.G. and H.G. testified that they never discussed the abuse with each other. Their testimony indicates that neither girl witnessed the other being abused.

There were no eyewitnesses to the alleged sexual abuse. The girls' parents testified that the chair where the assaults allegedly took place was immediately visible upon walking into the house from the usual entrance from the garage. H.G. described that when the assaults took place, no other adult was at home, and her sister and brother were not in the room. M.G. described that neither Armstrong's wife nor granddaughter were home when the assaults occurred but that H.G. and her brother were sometimes in the room when she was being assaulted.

### (c) Defense

#### (i) Armstrong's Granddaughter

The State closed, and Armstrong presented his defense. Armstrong's granddaughter was the first witness to testify. The granddaughter testified that she lived in the Armstrongs' home from December 2006 to March 2008. She explained that she was "frequently" around the living room area when the children were being babysat on Wednesdays after school. She was usually at the Armstrongs' home from the time they were picked up at school until shortly before the children were to be picked up by their parents. The granddaughter testified that Armstrong's wife was usually home by 2:30 p.m. and was typically present when the children were there as well.

The granddaughter testified that the children loved to play "pretend games." She testified that the children also liked to sit on Armstrong's lap while watching television. The children would try to push each other off of Armstrong. Sometimes Armstrong would get on the floor with the children, who would then climb over him.

The granddaughter never observed the children anxious or nervous around Armstrong. The children never acted like they wanted to leave when their mother or father came to pick them up. According to the granddaughter, the children often stayed while their parents visited with the Armstrongs and, "[v]ery often," the children would stay for a while even after their parents had gone home.

### (ii) Armstong's Son-in-Law

Armstrong's son-in-law was the next witness to testify in Armstrong's defense. He testified that he had seen the children interacting with Armstrong on many occasions when visiting the Armstrongs' home. He often observed the children "jump all over" Armstrong. He never observed the children demonstrate any reluctance to be around Armstrong.

The son-in-law testified that he was present during the incident in which one of the girls was being passed over the fence and said "'don't touch my privates.'" The son-in-law testified that, in fact, he heard the girls say "'don't touch my privates'" casually in other contexts—at least four or five times. Once, the girls said this when they were sitting on his wife's lap. It seemed to the son-in-law that the girls "were just saying it," sometimes "giggling" when they did. He indicated that the girls said this when they were not actually being touched in an inappropriate way.

During cross-examination, the State questioned the son-in-law at length about what materials he had reviewed prior to trial. The son-in-law explained that he had read the girls' pretrial depositions. Furthermore, the son-in-law confirmed that he had seen the Project Harmony video interviews of the girls. Upon further questioning, the son-in-law indicated that he, his wife, Armstrong, and Armstrong's wife had all seen the interviews. Soon thereafter, the trial came to a halt.

### (iii) Alleged Violation of § 29-1926

The State approached the bench and an off-the-record discussion was had. The prosecutors, defense counsel, defense cocounsel, and the trial judge then moved to the hallway, where they had another off-the-record discussion. When the judge returned from the hallway, he told the jurors that a legal issue had come up and he dismissed the jury for a 10-minute break.

During that break, the judge called the granddaughter to the stand. She had apparently not been informed of the sequestration order before she testified. As a result, she had been in the courtroom after she testified, though not before. Armstrong's granddaughter told the judge that she had not spoken to anyone about her testimony or any testimony she had heard.

The judge asked the State if it was moving for a mistrial, apparently based on either the failure to sequester the granddaughter or on the fact that several family members who were to be called as witnesses had seen the interviews. The State said that it did not wish to move for a mistrial. The judge explained his view that there had been two violations of court orders, and he urged defense counsel to "follow the orders of this Court and the ethical code that you're both bound by as attorneys."

Another off-the-record discussion was had in the hallway. When the parties returned to the courtroom, the trial judge asked if the State had a motion. Defense counsel and the State asked for more time. The trial judge was reluctant to extend the trial beyond the duration that the jury was originally told, but the trial judge agreed to give the parties until after lunch. The jury was brought back in and dismissed for lunch. The court explained to the jury that the attorneys were "trying to resolve some issue with the witnesses."

Sometime during the break, the State moved on the record to exclude the testimony of Armstrong's wife and daughter and strike the son-in-law's testimony. The State explained that it believed defense counsel had violated the court discovery order and § 29-1926. Defense counsel responded that he did not have any objection to the State's motion and that he regretted any violation that had occurred.

The court questioned Armstrong about whether he had adequate time to speak with his attorney and whether he understood what was going to occur as a result of the State's motion. Armstrong indicated that he had and did.

The court granted the State's motion. When the trial reconvened, the jury was told only that they should disregard the son-in-law's testimony in its entirety. No other instruction or explanation was given with regard to the son-in-law or the absence of Armstrong's wife and daughter as witnesses.

### (iv) Pretrial Discovery Ruling
### on Interviews

During discovery before trial, defense counsel had asked, pursuant to § 29-1926(2)(a), that the State release any recorded interviews of the children. The State responded that it had no objection, and the court issued the following order:

> ON THIS 25th day of March, 2009, the above-captioned matter came on before the Court on the Oral Request of counsel for [Armstrong], pursuant to Neb. Rev. Stat. § 29-1926(2)(a)(b), moves this Court for an Order allowing counsel for [Armstrong] to release a copy of the videotape recorded at Project Harmony, of the alleged victims in this matter. Said release is for the sole purpose of preparation for trial and for use by the expert witness. The Sarpy County Attorney's Office has no objection to the expert witness receiving a copy of the videotape and all parties agree that said tape shall be returned to counsel for [Armstrong] upon completion. It is further agreed that the expert witness shall keep a copy of the videotape in a secure locked location while in her possession.

The court also advised defense counsel:

> [Armstrong's] motion for the videotape pursuant to [§] 29-1926(2)(a) is granted and any state or agency in possession of a videotape of a child victim involved in this case is ordered to release the videotape to [Armstrong's] attorney, but [Armstrong's] attorney must comply with Nebraska law in *handling the storage of the videotape*. Do you understand what I'm saying [defense counsel]?

(Emphasis supplied.) Defense counsel affirmed that he understood.

Section 29-1926 primarily concerns the admissibility of videotape depositions or in camera testimony in lieu of courtroom testimony for child victims upon a showing of compelling need. Subsection (2) of § 29-1926 was added in 1997, through 1997 Neb. Laws, L.B. 643, § 1. It states in full:

> (2)(a) No custodian of a videotape of a child victim or child witness alleging, explaining, denying, or describing an act of sexual assault pursuant to section 28-319, 28-319.01, or 28-320.01 or child abuse pursuant to section 28-707 as part of an investigation or evaluation of the abuse or assault shall release or use a videotape or copies of a videotape or consent, by commission or omission, to the release or use of a videotape or copies of a videotape to or by any other party without a court order, notwithstanding the fact that the child victim or child witness has consented to the release or use of the videotape or that the release or use is authorized under law, except as provided in section 28-730. Any custodian may release or consent to the release or use of a videotape or copies of a videotape to law enforcement agencies or agencies authorized to prosecute such abuse or assault cases on behalf of the state.
>
> (b) The court order may govern the purposes for which the videotape may be used, the reproduction of the videotape, the release of the videotape to other persons, the retention and return of copies of the videotape, and any other requirements reasonably necessary for the protection of the privacy and best interests of the child victim or child witness.
>
> (c) Pursuant to section 29-1912, the defendant described in the videotape may petition the district court in the county where the alleged offense took place or where the custodian of the videotape resides for an order releasing to the defendant a copy of the videotape.
>
> (d) Any person who releases or uses a videotape except as provided in this section shall be guilty of a Class I misdemeanor.

### (v) Armstrong's Testimony

After reconvening, Armstrong testified in his own defense. Armstrong confirmed that he always sat in a certain recliner that was immediately visible from the garage door entrance. There, he would often have M.G., H.G., or the girls' brother on his lap while they watched television. The children sometimes competed with each other as to whose turn it was to sit on his lap.

Armstrong testified that his daughter and son-in-law, who lived nearby, had an open invitation to come to the Armstrongs' house anytime and that they often did. They came in through the garage door with the garage code. His granddaughter also came and went that way. Armstrong testified that his wife was usually home from her job by 3 p.m. and would assist with the babysitting at that time.

Armstrong said that sometimes he would sit on the floor and let the children "pile on" him. During one such incident, Armstrong recalled that he moved H.G. off of him because her brother was screaming that he was getting crushed. H.G. said, "'don't touch my private parts.'" Armstrong also recalled the incident when he helped lift the girls over the fence. He did not recall the girls saying "'don't touch my private parts'" on any other occasions.

Armstrong denied ever touching any of the children in an inappropriate manner. Armstrong said he never heard the children object to being babysat, nor did they seem afraid while in the Armstrongs' home.

During cross-examination, Armstrong acknowledged that he had reviewed the girls' pretrial depositions and the interviews prior to trial.

### (vi) Defense Expert Witness

Armstrong's expert witness was the last to testify in Armstrong's defense. The expert witness discussed the fact that a mental health examiner of a possible victim must be aware of alternate explanations for the victim's report, because the report could be inaccurate. If the report is simply taken at face value, an inaccurate report could be solidified

through the interview process by the authority figure. Based on the expert's review of the therapy notes and other information, the expert opined that certain facts could provide an alternative explanation of M.G.'s and H.G.'s reports of abuse. Particularly, the expert noted family tension and the occasional absence of the father from the home.

### (d) Rebuttal

During rebuttal, the State recalled the girls' mother. She reiterated that the granddaughter did not appear to be home very often when the girls were being babysat. Indeed, Armstrong described the granddaughter as using the Armstrongs' house as a "pit stop."

The girls' mother was also asked what she had reviewed before testifying. The mother said she had reviewed only her own deposition. She had not seen the interviews. The mother explained that Project Harmony and the prosecutor's office had told her she was "not allowed to see them because they were evidence." The mother answered in the affirmative to the prosecutor's question, "And you wanted your testimony to be untainted?" The mother further explained that she did not want to "jeopardize my case." The State continued this theme of tainted witnesses during closing arguments. The prosecutor said that Armstrong's witnesses were "rehearsed," while the prosecution witnesses "just got up here and told you the truth."

### (e) Convictions

The jury found Armstrong guilty of all three charges. He was sentenced to imprisonment of 15 to 30 years on count I, 5 to 5 years on count II, and 5 to 5 years on count III. All sentences were ordered to run concurrently. In a September 28, 2010, memorandum opinion, Armstrong's convictions and sentences were affirmed on direct appeal to the Nebraska Court of Appeals in case No. A-09-973. Although Armstrong had different counsel on direct appeal and attempted to raise the issue of ineffective assistance of trial counsel, the Court of Appeals found that the record was insufficient to address the ineffective assistance claims.

## 2. POSTCONVICTION

Armstrong subsequently brought a petition for postconviction relief. Armstrong made several allegations, but the court granted an evidentiary hearing only on the issue of whether trial counsel was ineffective for stipulating and advising Armstrong to stipulate to allow witness testimony to be stricken after it was revealed that the witnesses had viewed the interviews. The court's order denying an evidentiary hearing on the other alleged grounds for postconviction relief was summarily affirmed in an order filed on February 2, 2012, in case No. A-11-396, by the Court of Appeals, and is not at issue in this appeal.

At the evidentiary hearing, Armstrong presented the testimony of his counsel, cocounsel, wife, and daughter. The State presented the testimony of one of the prosecutors at Armstrong's trial.

### (a) Prosecutor

The prosecutor testified that the discussion in the hallway centered around § 29-1926, and whether there had been a violation of a court order. It appeared at that time that neither he nor any of the other parties to that discussion had ever dealt with a similar situation before: "[I]t was all sort of new to all of us, frankly, including the judge." The prosecutor testified he was focused on the effect this breach had on the trial, and not on a criminal prosecution of defense counsel.

Eventually, the prosecutor told defense counsel that the son-in-law's testimony should be stricken and that the remaining witnesses, except Armstrong's expert and Armstrong, excluded. The prosecutor did not recall any discussion about a mistrial. The prosecutor could not recall any other time in his experience when he had asked that a defense witness' entire testimony be stricken. Nevertheless, the prosecutor told defense counsel that, with or without an agreement, he was going to move to strike the son-in-law's testimony and to exclude the remaining family witnesses' testimony.

The prosecutor testified that after defense counsel consulted with Armstrong, defense counsel and the prosecutor had a final discussion wherein they reached an agreement to

strike/exclude the witnesses who had seen the interviews. It was the prosecutor's recollection that the agreement was presented to the judge and that the State thus never needed to make a motion to strike/exclude the witnesses' testimony.

The prosecutor also testified that he did not believe Armstrong's son-in-law "came off well." He thought that the son-in-law's demeanor was offputting and that his answers were not consonant with the facts or the circumstances of the case.

### (b) Defense Counsel

Defense counsel testified at the evidentiary hearing that he did not give Armstrong any specific instructions when Armstrong took the interviews home other than to look for any inconsistencies between Armstrong's and the girls' descriptions of events. Counsel further testified that he was unaware until the son-in-law's testimony at trial that anyone other than Armstrong and his expert witness had viewed the interviews.

Counsel testified that up to the moment of the son-in-law's revelation and the State's side bar, he was still planning on calling Armstrong's wife and his daughter as witnesses in support of Armstrong's defense. They would have testified that the girls' interaction with Armstrong was positive; the girls never appeared to have any fear or trepidation of contact with Armstrong. Counsel had some reservations about the demeanor of Armstrong's wife, but was planning on calling her despite those reservations.

Counsel described that things became "stressful" once it was revealed that several of Armstrong's witnesses had viewed the interviews. During the discussion in the hallway, the trial judge suggested that cocounsel speak for counsel, as counsel may have committed a crime. In a later conversation, the chief deputy county attorney told counsel that the State had a right to a mistrial or to strike or exclude the testimony of any defense witness who had viewed the interviews.

Counsel testified that he and cocounsel formulated a plan. When formulating that plan, counsel and cocounsel did not conduct any research or seek any advice as to whether any

violation had actually occurred, other than briefly reading § 29-1926. Counsel could not recall formulating any idea about whether they had actually violated a court order or committed a crime or ethical violation.

Counsel was under the impression that the court would grant a motion by the State to strike and exclude the testimony of those witnesses who had viewed the interviews. Counsel was not sure if a mistrial would be granted. In the event that a mistrial were granted, counsel considered whether Armstrong would have a better chance on retrial. Counsel determined he would not. Counsel's assessment of Armstrong's likely success in a new trial after mistrial was based on his conclusion that there was "a likelihood that any witnesses that had viewed that tape would still be barred from testifying" during the second trial after a mistrial.

Counsel thought that the cross-examination of the girls had been effective and that the second time around, the State would be able to better prepare its witnesses for trial based on the transcript of the witnesses' testimony from the first trial. In any event, counsel thought the son-in-law's testimony had not gone well. He thought the son-in-law's testimony directly contradicted some of Armstrong's daughter's testimony that she gave in her pretrial deposition. The son-in-law also leaned back in his chair "almost like he was lounging, and he would take little sips" from a water bottle while testifying. Counsel did not think that Armstrong's wife would make a particularly good witness either, because in the pretrial deposition, she had come off as "very bitter and cold and confrontational." In sum, counsel did not think that striking the son-in-law's testimony and excluding the daughter's and the wife's testimony was "a big deal."

Counsel told Armstrong that his best advice was to go ahead with trial and, although he was less clear on this point, to not object to the striking of the son-in-law's testimony or to excluding the testimony of his wife and daughter. Counsel testified that he did not consider asking the judge for a continuance to research issues concerning the disclosure of the interviews.

### (c) Defense Cocounsel

Defense cocounsel described that the trial "stopped" when the son-in-law revealed he had seen the interviews. During the hall discussion the judge told cocounsel he needed to speak for counsel. Cocounsel felt "the situation was very ominous." Counsel seemed "nervous," and cocounsel was "scared for" counsel.

Cocounsel testified that he was unfamiliar with § 29-1926. He did not think about doing further research on the statute. It was an "unusual situation."

Cocounsel thought that "[t]hings were happening fast" and that he "wasn't comfortable with the situation." But cocounsel testified that the jury was waiting and that there was a "sense that it needed — something needed to be decided here fairly quickly." Counsel and cocounsel did not discuss the possibility of asking for more time to research the issue, but they did discuss whether counsel would be allowed to continue to represent Armstrong. They determined that if the judge did not allow counsel to continue Armstrong's representation, cocounsel, who had only recently begun assisting in the case, would not be able to assume counsel's responsibilities.

### (d) Armstrong

Armstrong testified at the evidentiary hearing that before the trial, counsel called him and told him to pick up the interviews from counsel's law offices. Counsel was sick that day, and a law clerk gave the interviews to Armstrong. Neither counsel, the law clerk, nor any other person gave Armstrong instructions regarding who could view the interviews.

Armstrong testified that he, his wife, daughter, son-in-law, son, and daughter-in-law all viewed the interviews. He, his wife, daughter, and daughter-in-law later met with counsel to discuss the interviews. Armstrong stated that counsel would have been aware that they had viewed the interviews.

When it came out during the son-in-law's testimony that Armstrong's witnesses had seen the interviews, Armstrong described that it "was almost a complete halt to the trial" and that both counsel and cocounsel were "severely chastised by

the prosecution." Armstrong recalled that this occurred both in front of the jury and outside of the jury's presence. At one point, outside the presence of the jury, Armstrong heard one of the prosecutors say they "ought to put them all in jail."

Counsel explained to Armstrong that viewing the interviews was considered "a breach of law." Armstrong testified that counsel seemed "[n]ervous." Armstrong had never seen counsel that way. Counsel told him that if they tried to call his remaining family witnesses and did not strike the testimony of the son-in-law, then the prosecution would ask for a mistrial, which would likely be granted. Counsel thought a mistrial would be bad for Armstrong. Counsel did not explain that they had the option to resist the State's motion to strike and to exclude his witnesses' testimony. Armstrong testified that had he been told he had the option to resist the State's motion, Armstrong would have "definitely" chosen to resist and to have his witnesses testify.

### (e) Armstrong's Wife and Daughter

Armstrong's wife testified at the evidentiary hearing that they had told counsel they had seen the interviews. Armstrong's wife testified that counsel, upon learning that family members had seen the interviews, did not make any comment indicating that they should not have viewed them.

Armstrong's wife expected to testify at trial until "everything went crazy." Had she been allowed to testify, her testimony would have been that she was usually present—approximately "nine-tenths of the time"—when Armstrong was babysitting M.G. and H.G.

Armstrong's daughter testified at the evidentiary hearing that after her husband revealed they had seen the interviews, she heard that if they went ahead with the planned testimony, the State would ask for a mistrial. She explained that had she been allowed to testify at trial, she would have testified that she lived less than a mile from the Armstrongs' home and dropped by often. She would have testified that she never saw anything inappropriate, and she would have described M.G.'s and H.G.'s demeanor around Armstrong. The daughter also would have testified that the girls had made similar

allegations about being touched inappropriately by other people. For example, there were times that they would be sitting on her lap and say, "'don't touch my privates.'"

### 3. Order Granting
### Postconviction Relief

In its order following the hearing, the postconviction court took judicial notice from its file of a September 26, 2008, order allowing Armstrong to inspect and make a copy of any videotaped statements of the girls regarding the alleged assaults. The court also recognized the March 25, 2009, order allowing the expert witness to view the interviews.

The court stated that neither discovery order specifically prohibited Armstrong from having a copy of the video or showing it to other potential witnesses. The court found that counsel gave no instructions or direction to Armstrong about who could view the interviews. Armstrong viewed the interviews with his wife, daughter, son, daughter-in-law, and son-in-law. The court found that Armstrong did not tell counsel that others had viewed the interviews.

The court found that defense counsel had planned on calling Armstrong's wife, daughter, son-in-law, granddaughter, and the expert witness. During opening statements, counsel told the jury they would be hearing from Armstrong's family. After the State rested its case, defense counsel still planned on calling all of those witnesses.

The postconviction court found that after the son-in-law's testimony, the trial judge told counsel he may have violated § 29-1926 and could be facing a criminal charge. Further, the trial judge told counsel that he had a right to remain silent and that he should have cocounsel speak on his behalf. Counsel was "visibly shaken."

The postconviction court found that the chief deputy from the county attorney's office told defense counsel that the options were asking for a mistrial or excluding witnesses who had watched the interviews from testifying and striking the witness who already testified. Counsel and cocounsel did not attempt to research whether a breach of § 29-1926 had actually occurred. Neither did they consider requesting a continuance.

Counsel and cocounsel discussed whether counsel could continue to represent Armstrong in light of the trial judge's comments about a possible violation, but they did not legally resolve that issue.

The postconviction court found that counsel believed there was a likelihood the witnesses who viewed the interviews would be excluded in a second trial if a mistrial were granted. In light of that, counsel did not believe a second trial would be to Armstrong's advantage; a new trial would give the State a chance to prepare for his witnesses. Counsel advised Armstrong to accept an agreement made with the State to strike and exclude Armstrong's witnesses in exchange for the State's not asking for a mistrial. Armstrong followed this advice.

The postconviction court found that the possible criminal violation facing counsel had a "chilling affect [sic] on his representation of Armstrong." Counsel's decision not to attempt to call Armstrong's wife or to resist the motion to exclude the son-in-law's testimony "was not a strategic or tactical decision." "[T]he trial strategy was changed because of an alleged discovery violation which carried criminal sanctions." In particular, counsel's "decision to agree with the State to exclude [Armstrong's wife's] testimony seemed to be more for accommodation to satisfy the State's ire, and avoid the criminal violation of Neb. Rev. Stat. [§] 29-1926, instead of trial strategy that would help Armstrong's defense." The postconviction court concluded that "[t]here was no real strategy other then [sic] to avoid a mistrial being requested by the State."

The postconviction court found that this was "a case that was entirely a she said, he said case. Credibility of the witnesses was the major issue for the trier of fact."

The court found that the son-in-law's testimony provided "substantive supportive credibility evidence." Further, the wife's testimony "was of major importance."

The court found that the decision not to call Armstrong's daughter was primarily strategic. Counsel realized that after Armstrong's son-in-law testified differently than expected, there was a problem of the daughter's impeachment if called.

The court concluded that defense counsel's representation of Armstrong was deficient. The court said that "[o]ne can argue" the discovery order concerning the interviews allowed no use of the interviews other than what was specifically ordered by the court. However, "[b]ecause of the language of the discovery trial orders in this case, and the language of Nebraska Statutes it is highly unlikely that any sanctions to strike or exclude witnesses would be granted."

The court also concluded that defense counsel should not have continued to represent Armstrong in light of the chilling effect of the threat of criminal and ethical violations—at least not without taking some steps to ensure he had some legal basis before continuing representation. Further, it was unreasonable for counsel to agree with the State's motion to allow the son-in-law's testimony to be stricken and the wife's testimony to be excluded, without having a legal basis for conceding the issue to the State.

The postconviction court concluded that at a minimum, counsel should have asked for a continuance. According to the court, counsel "literally abandoned his planned trial strategy, in the wake of the States [sic] intended requests without any legal basis."

The "big question," the court considered, was, "What did [counsel] get for himself and his client by recommending Armstrong consent to the State's request to strike and exclude his witnesses?" The court concluded that counsel did not get much. The court said that even counsel opined that the State would not get a mistrial.

The postconviction court concluded that Armstrong was prejudiced by counsel and cocounsel's deficient performance. There was a reasonable probability that but for counsel's unprofessional errors resulting in the absence of witnesses who would have provided credibility evidence, especially given the negative inference accompanying their failure to testify, the result of the proceeding would have been different.

In particular, the court found that agreeing to strike the son-in-law's testimony was prejudicial, because the son-in-law's testimony included observations of the girls, whose credibility was central to the case against Armstrong. Furthermore,

striking the son-in-law's testimony in its entirety without explanation or direction "likely leaves a negative inference in the minds of the trier of fact." The court elaborated:

> When a judge tells jurors to disregard the entire testimony of a parties' witness who has testified extensively before them without more of an explanation or direction, it more likely leaves a negative inference in the minds of the trier[s] of fact. . . . It is common sense that when a judge directs you to disregard the testimony of a person who has been testifying for a party it is not a good thing for that party.

Similarly, agreeing to exclude Armstrong's wife's testimony was prejudicial. She "had a substantial amount of evidence regarding her husband that only she could give to help him with any credibility issues before the jury." The court found little weight should be given to counsel's stated concerns about the wife's coming off as bitter and angry. This attitude was "perfectly understandable and reasonable given the accusations against her husband. It is something that can be explained to the jury if needed." And, as with the son-in-law, the court reasoned that there was a possible negative inference that the trier of fact could have made from her failure to testify.

Finally, the court rejected the idea that Armstrong had waived the ineffective assistance of counsel through his colloquy with the trial judge. Armstrong was relying on defense counsel's ineffective advice. "For there to be a valid waiver of Armstrong's claim for ineffective assistance of counsel . . . , Armstrong would have had to know not just what was being advised by [counsel], but, what [counsel] was advising was professionally deficient and prejudicial to his defense."

The court vacated Armstrong's convictions and granted a new trial. The State appeals.

## III. ASSIGNMENT OF ERROR

The State assigns that the postconviction court erred by vacating Armstrong's convictions upon concluding that Armstrong was deprived of his federal and Nebraska constitutional right to effective assistance of trial counsel.

## IV. STANDARD OF REVIEW

[1] In an evidentiary hearing, as a bench trial provided by Neb. Rev. Stat. § 29-3001 et seq. (Reissue 2008 & Cum. Supp. 2014) for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in evidence and questions of fact, including witness credibility and weight to be given a witness' testimony.[1] In an appeal involving such a proceeding for postconviction relief, the trial court's findings will be upheld unless such findings are clearly erroneous.[2] In contrast, the appellate court independently resolves questions of law.[3]

[2] A postconviction claim that defense counsel provided ineffective assistance generally presents a mixed question of law and fact.[4]

## V. ANALYSIS

[3] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[5] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[6] Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.[7] Findings of fact include the circumstances of the case and the counsel's conduct and strategy.[8] It is a question of law, however, whether those facts show counsel's performance was deficient and prejudiced the defendant.[9]

---

[1] *State v. Canbaz*, 270 Neb. 559, 705 N.W.2d 221 (2005).

[2] *Id*.

[3] See *State v. Marks*, 286 Neb. 166, 835 N.W.2d 656 (2013).

[4] See, *State v. Banks*, 289 Neb. 600, 856 N.W.2d 305 (2014); *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

[5] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[6] *State v. Castillo-Zamora*, 289 Neb. 382, 855 N.W.2d 14 (2014).

[7] *Strickland v. Washington, supra* note 5. See, also, *State v. Banks, supra* note 4; *State v. Dubray, supra* note 4.

[8] *State v. Thiel*, 264 Wis. 2d 571, 665 N.W.2d 305 (2003).

[9] See *State v. Dubray, supra* note 4.

The State argues that defense counsel's effectiveness must be viewed in light of "the uncharted waters of whether the [postconviction] court's pretrial order on disclosure and review of the Project Harmony tape had been violated."[10] Forgoing the testimony of Armstrong's wife and son-in-law, according to the State, was a reasonable strategic decision given the potential of a mistrial. Even if counsel's performance was deficient, the State asserts that forgoing the testimony of Armstrong's wife and son-in-law had an isolated, trivial effect on the trial and was, at best, cumulative of the testimony of Armstrong's granddaughter. We disagree.

## 1. Ineffectiveness of Counsel

[4] "'[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"[11] Counsel's performance was deficient if, in light of all the circumstances, it did not equal that of a lawyer with ordinary training and skill in criminal law.[12]

[5] "'In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.'"[13] However, an appellate court will not second-guess reasonable strategic decisions by counsel.[14] Counsel's failure to raise novel legal theories or arguments or to make novel constitutional challenges in order to bring a change in existing law does not constitute deficient performance.[15]

We reject the State's contention that defense counsel's actions were reasonable in light of the novelty of the situation presented at trial. This case is not about counsel's failing to raise novel arguments. The novel argument was thrust before

---

[10] Brief for appellant at 18.

[11] *State v. Joubert*, 235 Neb. 230, 237, 455 N.W.2d 117, 123 (1990).

[12] See, *State v. Dubray, supra* note 4; *State v. Joubert, supra* note 11.

[13] *State v. Joubert, supra* note 11, 235 Neb. at 237, 455 N.W.2d at 123.

[14] *State v. Poe*, 284 Neb. 750, 822 N.W.2d 831 (2012).

[15] *State v. Sanders*, 289 Neb. 335, 855 N.W.2d 350 (2014).

counsel and had to be resolved. Defense counsel's failure to research law he was unfamiliar with before deciding how to respond to that novel situation constituted conduct unequal to that of a lawyer with ordinary training and skill in criminal law.

This is especially true because counsel's uninformed decision was not one to be taken lightly. Counsel removed most of the planned defense witnesses from the jury's consideration, left the jury without any explanation as to why one defense witness' entire testimony was stricken and other family members were never called, and waived any error on direct appeal pertaining to the absence of these witnesses' testimony.

Defense counsel may have reached the agreement with the State to strike and exclude defense witnesses in order to avoid a mistrial. But counsel assumed a mistrial would disadvantage Armstrong, because counsel assumed that in a retrial after mistrial, Armstrong's son-in-law and wife would not be allowed to testify. That assumption was made without knowledge of the relevant law and without asking for a continuance to research the relevant law. It was not reasonable to formulate such a strategy without knowing if it would be legally correct for the trial court to strike and exclude the defense witnesses or to grant a mistrial under the circumstances presented.

We also agree with the postconviction court that the prospect of criminal or ethical violations had a chilling effect on defense counsel's representation. The postconviction court did not clearly err in finding that the trial judge told defense counsel he may be facing a criminal charge and had a right to remain silent. And, as a result, counsel was "visibly shaken."

[6] The right to effective assistance of counsel entitles the accused to his or her counsel's undivided loyalties, free from conflicting interests.[16] Defense counsel's interest in avoiding criminal or ethical sanctions was in conflict with Armstrong's interest in presenting the strongest defense possible. As the postconviction court stated, counsel appeared to be trying to accommodate and satisfy the State's ire in order to avoid a

---

[16] *State v. Edwards*, 284 Neb. 382, 821 N.W.2d 680 (2012).

criminal violation rather than adopting a trial strategy that would benefit Armstrong. We note also that the failure to ask for a continuance seemed principally designed to prevent further irritation of the trial judge. Agreeing to strike and exclude defense witnesses without so much as asking for a continuance was more an act of appeasement for counsel's benefit than trial strategy to benefit Armstrong's defense.

## 2. PREJUDICE

[7,8] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[17] A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome.[18]

[9] As discussed, there was an actual conflict of interest in counsel's continued representation of Armstrong.[19] An actual conflict for Sixth Amendment purposes is a conflict that adversely affects counsel's performance.[20] If the defendant shows that his or her defense counsel faced a situation in which conflicting loyalties pointed in opposite directions and that his or her counsel acted for the other client's interest and against the defendant's interests, prejudice is presumed.[21]

But even if we do not apply such presumption, we easily conclude that actual prejudice resulted from counsel's deficient performance. The effect of counsel's inadequate performance is evaluated in light of the totality of the evidence at trial:

"Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the

---

[17] *State v. Poe, supra* note 14.

[18] See, *Strickland v. Washington, supra* note 5; *State v. Poe, supra* note 14.

[19] See *State v. Edwards, supra* note 16. See, also, *Mickens v. Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002).

[20] *Id*.

[21] *Id*.

entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."[22]

The State does not argue that defense counsel's failure to object was not prejudicial because it would have been legally sound to strike and exclude Armstrong's witnesses. To do so, the State would have to argue not only that a discovery violation actually occurred, but also that exclusion of defense witnesses was an appropriate sanction in light of the compulsory process rights of the defendant to present witnesses in his or her own defense.[23] The State does not make such arguments.

[10] Rather, the State argues that counsel's performance did not prejudice Armstrong because the testimony of Armstrong's wife and son-in-law would have been cumulative to the

---

[22] *State v. Poe, supra* note 14, 284 Neb. at 774-75, 822 N.W.2d at 849, quoting *Strickland v. Washington, supra* note 5.

[23] *Taylor v. Illinois*, 484 U.S. 400, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988). See, also, *Michigan v. Lucas*, 500 U.S. 145, 111 S. Ct. 1743, 114 L. Ed. 2d 205 (1991); *Rock v. Arkansas*, 483 U.S. 44, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987); *Ferensic v. Birkett*, 501 F.3d 469 (6th Cir. 2007); *Noble v. Kelly*, 246 F.3d 93 (2d Cir. 2001); *Watley v. Williams*, 218 F.3d 1156 (10th Cir. 2000); *Tyson v. Trigg*, 50 F.3d 436 (7th Cir. 1995); *U.S. v. Johnson*, 970 F.2d 907 (D.C. Cir. 1992); *U.S. v. Peters*, 937 F.2d 1422 (9th Cir. 1991); *Escalera v. Coombe*, 852 F.2d 45 (2d Cir. 1988); *People v. Pronovost*, 773 P.2d 555 (Colo. 1989); *State v. Lamphere*, 130 Idaho 630, 945 P.2d 1 (1997); *People v. Flores*, 168 Ill. App. 3d 284, 522 N.E.2d 708, 119 Ill. Dec. 46 (1988); *Hurd v. State*, 9 N.E.3d 720 (Ind. App. 2014); *Darghty v. State*, 530 So. 2d 27 (Miss. 1988); *State v. Bradshaw*, 195 N.J. 493, 950 A.2d 889 (2008); *McCarty v. State*, 107 N.M. 651, 763 P.2d 360 (1988); *State v. Wilmoth*, 104 Ohio App. 3d 539, 662 N.E.2d 863 (1995); *White v. State*, 973 P.2d 306 (Okla. Crim. App. 1998); 5 Wayne R. LaFave et al., Criminal Procedure § 20.6(c) (3d ed. 2007).

testimony of Armstrong's granddaughter and would have thus had an isolated, trivial effect. When no physical evidence or eyewitness testimony links the defendant to the crime and the case is a matter of determining credibility, courts regularly reject the idea that errors relating to the exclusion or failure to call a witness could be harmless or nonprejudicial simply because another witness testified similarly.[24] As one court explained, "Evidence that provides corroborating support to one side's sole witness on a central and hotly contested factual issue cannot reasonably be described as cumulative."[25]

In this case, we agree with the postconviction court that the issue of credibility was a "paramount consideration." There was no physical evidence of abuse or eyewitnesses to the alleged acts. There was not "overwhelming" record support for the convictions.[26] The jury had to determine whether to believe the girls' or Armstrong's testimony. The surrounding circumstances such as the girls' behavior and Armstrong's opportunity to have committed the alleged repeated acts of abuse were thus hotly contested issues central to the jury's determination.

The State presented numerous witnesses who lent credibility to the girls' testimony by stating they had observed a decline in the girls' mental well-being and an increased reluctance to be around Armstrong. The girls' mother testified that Armstrong usually was alone with the girls when he babysat. But after striking the testimony of Armstrong's son-in-law and excluding the testimony of Armstrong's wife, the defense was able to present only one witness who could present a different account. The testimony of that one witness, Armstrong's

---

[24] See, e.g., *Grant v. Lockett*, 709 F.3d 224 (3d Cir. 2013); *Mosley v. Atchison*, 689 F.3d 838 (7th Cir. 2012); *Montgomery v. Petersen*, 846 F.2d 407 (7th Cir. 1988); *State v. Harris*, 132 Idaho 843, 979 P.2d 1201 (1999); *Com. v. Nock*, 414 Pa. Super. 326, 606 A.2d 1380 (1992). Compare *Lewis v. State*, 294 Ga. 526, 755 S.E.2d 156 (2014).

[25] *Mosley v. Atchison, supra* note 24, 689 F.3d at 848. See, also, e.g., *Arizona v. Fulminante*, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991); *Vasquez v. Jones*, 496 F.3d 564 (6th Cir. 2007).

[26] See *Strickland v. Washington, supra* note 5, 466 U.S. at 696.

granddaughter, was impeached by the girls' mother when she testified that the granddaughter was not often at home.

We cannot conclude, especially in light of such impeachment,[27] that Armstrong was not prejudiced by the failure to have before the jury the testimony of Armstrong's wife and his son-in-law. Both Armstrong's wife and his son-in-law would have lent credibility to Armstrong's testimony by describing how the girls were happy and comfortable around Armstrong. In addition, Armstrong's wife would have testified that she was around Armstrong when he was babysitting the girls "nine-tenths of the time." The wife's testimony, if believed, would have reduced Armstrong's opportunity to have committed the alleged repeated acts of abuse.

The son-in-law's and the wife's testimony would have accordingly altered the evidentiary picture that was presented to the jury and could have had a pervasive effect on the inferences to be drawn from the evidence. Even if Armstrong's son-in-law and wife did not present well to the jury, their demeanor could have been explained, as the postconviction court noted. Such concerns do not lead to the conclusion that their testimony would have been trivial.

We also agree with the postconviction court that the prejudicial effect of counsel's deficient conduct was compounded by the negative inferences the jury could have drawn from the unexplained striking of the son-in-law's testimony and the unexplained absence of Armstrong's wife. As to the son-in-law's testimony:

> When a judge tells jurors to disregard the entire testimony of a part[y's] witness who has testified extensively before them without more of an explanation or direction, it more likely leaves a negative inference in the minds of the trier[s] of fact. . . . It is common sense that when a judge directs you to disregard the testimony of a person who has been testifying for a party it is not a good thing for that party.

---

[27] See, *Mosley v. Atchison, supra* note 24; *Montgomery v. Petersen, supra* note 24; *State v. Harris, supra* note 24.

As to Armstrong's wife, there is a natural negative inference any time a defendant's spouse fails to testify. This is because the "logical inference is that a party would be likely to call as a witness a person bound to him by ties of interest or affection unless he has reason to believe that the testimony given would be unfavorable."[28]

The negative inferences deriving from the absence of the wife at trial was made even worse because the jury reasonably expected from opening statements that the wife would be testifying and the jury knew the wife was present at least some of the time Armstrong babysat the girls. The jury could not have helped but wonder why, bound not only by affection but as a witness to Armstrong's babysitting interactions, the wife did not attempt to lend credibility to Armstrong's testimony. In *Forensic v. Birkett*,[29] the court described the trial court as inflicting "double punishment" on the defendant by not only excluding the defense witnesses but by failing to instruct the jury as to the reason the witnesses described in opening statements were not testifying.

Thus, we agree with the postconviction court that Armstrong was prejudiced by defense counsel's deficient conduct of agreeing with the State to strike and exclude defense witnesses. Under the totality of the circumstances presented at trial, the decision would reasonably likely have been different but for counsel's error leading to the absence of the testimony of Armstrong's wife and son-in-law.

## VI. CONCLUSION

We agree with the postconviction court that Armstrong met both prongs of his burden under *Strickland v. Washington* to show there was such a denial or infringement of his rights as to render the judgment void or voidable.[30] We therefore affirm the judgment of the postconviction court, which vacated Armstrong's convictions and ordered a new trial. In accordance

---

[28] 1 Barbara E. Bergman & Nancy Hollander, Wharton's Criminal Evidence § 3:21 at 233 (15th ed. 1997).

[29] *Forensic v. Birkett, supra* note 23, 501 F.3d at 478.

[30] See § 29-3001.

with the appellate jurisdiction of the Supreme Court, the district court is directed, upon the release of this opinion and prior to the issuance of the mandate, to forthwith consider whether it would be appropriate to grant release of Armstrong on bond under any conditions it deems warranted.

AFFIRMED.

CASSEL, J., not participating.

———————————

State of Nebraska, appellee, v.
Joshua J. McIntyre, appellant.
___ N.W.2d ___

Filed May 29, 2015.    No. S-14-595.

1.  **Administrative Law: Statutes: Appeal and Error.** The meaning and interpretation of statutes and regulations are questions of law which an appellate court resolves independently of the lower court's conclusion.

2.  **Drunk Driving: Blood, Breath, and Urine Tests.** The State must establish four foundational elements for the admissibility of a breath test in a driving under the influence prosecution: (1) The testing device was working properly at the time of the testing; (2) the person who administered the test was qualified and held a valid permit; (3) the test was properly conducted under the methods stated by the Department of Health and Human Services; and (4) all other statutes were satisfied.

3.  **Criminal Law: Statutes: Legislature: Intent.** In reading a penal statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.

4.  **Criminal Law: Statutes.** Penal statutes receive a sensible construction, considering the evils and mischiefs sought to be remedied.

5.  ____: ____. A court will not supply missing words or sentences to make clear that which is indefinite in a penal statute, or supply what is not there.

6.  **Administrative Law.** For purposes of construction, a rule or regulation of an administrative agency is generally treated like a statute.

7.  **Administrative Law: Drunk Driving: Blood, Breath, and Urine Tests.** The driving under the influence statutes and the regulations promulgated by the Department of Health and Human Services do not bar evidence of the result of a chemical breath test with a deficient sample if the State lays sufficient foundation.

8.  **Criminal Law: Indictments and Informations.** Where a statutory crime may be committed by any of several methods, the indictment or information may charge in a single count that it was committed by any or all of the enumerated methods if they are not inconsistent with or repugnant to each other.